UNITED STATES of America

v.

Kenneth G. PARKER, Lance Corporal
(E–3), U.S. Marine Corps.

NMCCA 9501500.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 20 July 1993.

22 Aug. 2012.

For Appellee: Col Kurt J. Brubaker, USMC; Maj Paul Ervasti, USMC; Mr. Brian E. Keller, Esq.

Before J.A. MAKSYM, J.K. CARBERRY, M.D. MODZELEWSKI, Appellate Military Judges.

## PUBLISHED OPINION OF THE COURT

MAKSYM, Senior Judge:

In July 1993, a general court-martial composed of officer members convicted the appellant, contrary to his pleas, of conspiracy to rob and murder Lance Corporal (LCpl) Rodney Page, USMC, conspiracy to kidnap and murder LCpl Christopher James, USMC, two specifications of violating a lawful general order by possessing an unregistered firearm on base, the premeditated murder of LCpl Page, the felony murder of LCpl Page, the premeditated murder of LCpl James, the robbery of LCpl Page, the kidnapping of LCpl Page, and the kidnapping of LCpl James, violations of Articles 81, 92, 118, 122, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 892, 918, 922, and 934.

The appellant was sentenced to death, forfeiture of all pay and allowances, and reduction to pay grade E–1. On 15 June 1995, the convening authority approved the sentence and, except for the portion of the sentence extending to death, ordered the sentence executed.

On 11 October 1996, this court set aside the original convening authority's action and ordered the case sent to a different convening authority for new post-trial processing. The new convening authority approved the sentence as adjudged and, except for the portion of the sentence extending to death, ordered the sentence executed on 25 November 1997.

The case was then docketed with this Court on 23 December 1997. The appellant filed his initial brief on 23 July 1999, with the Government filing its answer on 10 May 2001. The appellant filed his reply on 14 April 2003. However, pursuant to the United States Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and upon the appellant's

For Appellant: Maj Kirk Sripinyo, USMC; Maj Jeffrey Liebenguth, USMC.

motion, the Court of Appeals for the Armed Forces (CAAF) ordered an abatement of proceedings that lasted several years while pleadings were filed on the question of whether the appellant was mentally disabled. After several more years, numerous briefs, and two *DuBay*[1] hearings, the appellant was determined not to be mentally disabled and, on 2 March 2011, his case was again docketed with this court. We ordered new, consolidated briefs from the appellant and the Government, and heard oral argument on 12 April 2012.

## I. Statement of Facts

### A. *Offenses committed against LCpl Page*

On the evening of 26 March 1992, LCpl Rodney Page, USMC, who had no connection with the appellant, was walking along a stretch of road in Jacksonville, North Carolina. Record at 504. Strung along the road were a series of lounges and nightclubs. *Id.* at 502. On his way to one of the lounges, LCpl Page was chased down and accosted by two men, the appellant and LCpl Joseph Adams, USMC, both of whom were holding shotguns. *Id.* at 504–07. They forced LCpl Page to walk into an alley between two of the buildings and demanded his wallet. *Id.* at 506–07, 674. LCpl Page begged for his life. *Id.* at 674. The two men took his wallet, released him, and turned as if to leave. *Id.* However, the appellant, after having assured LCpl Page that he would not be harmed, turned back around and shot him in the stomach at near point-blank range. *Id.* LCpl Page died shortly thereafter. Prosecution Exhibit 14.

This murder had as its genesis a discussion earlier that evening between six friends, all African–American Marines, in the appellant's barracks room onboard Camp Lejeune, North Carolina. Record at 555–56. With the appellant were LCpl Adams, LCpl Wade Walker, USMC, LCpl Terrence McDonald, USMC, LCpl Michael Curry, USMC, and LCpl Frederick Brown, USMC. *Id.* at 550. Although there are numerous and conflicting accounts regarding this meeting, what is clear is that most if not all the men involved were drinking alcohol, particularly the appel-

lant. *Id.* at 550–51. While drinking, the men were discussing racial tensions within their unit as well as a rumor that a group of Caucasian Marines had attempted to lynch an African–American Marine on Martin Luther King Jr.'s birthday. *Id.* at 555–56. Having heard this rumor around 2200, LCpl Walker said something had to be done about it. *Id.* at 554, 556. The appellant agreed and said "[w]e are going to get us a white boy tonight." *Id.* at 556, 663.

The men then left the barracks room and went to a nearby parking lot, where the cars of LCpl Walker and LCpl Brown were parked. LCpl Walker opened the trunk of his car, a white Chevrolet Corsica with the license plate "MRS W 4", and withdrew a shotgun he had recently purchased. *Id.* at 558, 663; PE 72 and 107. LCpl Walker put the shotgun back in the car and then, according to LCpl McDonald, said "[o]ne of those m\* \* \* \* \*f\* \* \* \* \*s is going down tonight." Record at 558. At some point, LCpl Brown went to his own car and retrieved a shotgun, which he gave to the appellant. *Id.* at 663–66.

The six Marines decided to get into the two cars, with LCpl McDonald driving LCpl Walker's car, joined by LCpl Walker and LCpl Adams. *Id.* at 561–62, 666. LCpl Curry drove LCpl Brown's car and was joined by LCpl Brown and the appellant, who was still holding LCpl Brown's shotgun. *Id.* at 561, 666–67. The two groups drove to a base store where they purchased a 40–ounce bottle of malt liquor, some gas, and began to discuss the best place to murder someone. *Id.* at 564. The appellant suggested Jacksonville, while LCpl Adams disagreed and LCpl McDonald suggested Kinston, North Carolina. According to LCpl McDonald, the appellant replied "No, it can be done right here in Jacksonville. Who is going to find out?" *Id.* at 564–65.

Having picked a location, the group left Camp Lejeune and began cruising through the city of Jacksonville with LCpl Walker's car in the lead. *Id.* at 566. By this point, LCpl Brown had loaded the shotgun for the appellant, who was riding in the front pas-

1. *United States v, DuBay,* 37 C.M.R. 411, 1967 WL 4276 (C.M.A.1967).

senger seat drinking part of the 40–ounce bottle of malt liquor, and returned it to him. *Id.* at 667–68. According to LCpl Brown, the appellant said that he and other Marines had previously discussed killing a white man, but that "we were finally putting our words into action." *Id.* at 722.

The group came upon a white man walking along the side of the road, but LCpl Mc-Donald drove by without stopping, infuriating LCpl Walker. *Id.* at 568. The pair of cars stopped in a parking lot and the parties briefly discussed the situation, with LCpl Walker berating LCpl McDonald for driving past the white pedestrian without doing anything. *Id.* at 569–71. The group then decided that they would take their future victim's wallet to make the murder seem like a robbery and that LCpl Curry would take the lead in LCpl Brown's car. *Id.* at 570.

The Marines continued driving, with the appellant asking LCpl Curry to drop him off near Court Street in Jacksonville so that he could shoot someone. *Id.* at 669. LCpl Curry refused this request and instead drove to a gas station. *Id.* at 670. When leaving the station, the appellant told LCpl Curry to let him out near a truck that was also leaving the station so that he could shoot the driver. *Id.* Both LCpl Curry and LCpl Brown told the appellant it wasn't a good idea because the truck had Georgia license plates and both LCpl Curry and LCpl Brown were from Georgia. *Id.* at 671.

The cars headed south on Route 17 to the outskirts of Jacksonville. As they approached a strip of lounges and nightclubs, LCpl Curry pointed out a white man standing outside one of the clubs. *Id.* The appellant said "[t]hat's the one we are getting tonight." *Id.* at 671–72. As both cars pulled off the road, the appellant and LCpl Adams, both carrying loaded shotguns, got out of their respective cars and began chasing the man they had observed, LCpl Rodney Page. *Id.* at 504, 672–73.

The two men caught up to LCpl Page, grabbed him and led him at gunpoint to the alley between two buildings. *Id.* at 504–06. LCpl Adams took LCpl Page's wallet as LCpl Page begged for his life. *Id.* at 674. The appellant told LCpl Page that he would

not get shot and turned as if to go, but then turned back towards LCpl Page and shot him in the upper abdomen. *Id.* The appellant and LCpl Adams retreated from the scene, with the appellant running back across Route 17 to meet up with LCpl Curry and LCpl Brown in LCpl Brown's car. *Id.* at 508, 579–80. At the same time, LCpl Adams ran to LCpl Walker's car, telling LCpl Walker and LCpl McDonald that the appellant had shot LCpl Page. *Id.* at 578.

When the appellant returned to LCpl Brown's car, he was excited. *Id.* at 675. He bragged about LCpl Page begging for his life and the performance of the shotgun. *Id.* at 674. In response to LCpl Curry's expression of sympathy for LCpl Page's family, the appellant said "[f]orget his family." *Id.* at 675. As the cars drove away, they saw a police car and the appellant said "[g]et me out of here. I never did a white boy. I did a black dude, but never did a white boy. Get me out of here." *Id.* at 676. At this point, the appellant appeared to be intoxicated, but was able to speak, run and operate a weapon without difficulty. *Id.* at 585, 675.

The cars continued away from the murder scene, at one point splitting up to avoid a vehicle that seemed to be following them. *Id.* at 677. Once again driving together, the two cars took several more turns and then stopped, with all six Marines exiting the vehicles. *Id.* at 584, 677. The appellant began hugging his friends and recounting with excitement how he had murdered LCpl Page. *Id.* at 584–85, 677–78. In particular, he told the others how LCpl Page had begged for his life. *Id.* at 585.

The discussion then turned to hiding the shotgun; the appellant suggesting they take the shotgun he had just used to his girlfriend Omega Clark's house. *Id.* at 678–79. When asked if Ms. Clark was trustworthy, the appellant stated that he would trust her with his life. *Id.* at 679. The group agreed on an alibi suggested by LCpl Curry, that they had been at a club in Wilmington, North Carolina. *Id.* At that point, the Marines got back into the two cars and the appellant, LCpl Brown, and LCpl Curry drove to Ms. Clark's house while LCpl Walker, LCpl Mc-

Donald, and LCpl Adams drove in another direction. *Id.* at 587.

The appellant directed LCpl Curry to Ms. Clark's house. *Id.* at 679. When they pulled up to the house, LCpl Brown handed the appellant the shotgun in its camouflage carrying case; the shotgun had been cleared of the spent shell earlier in the drive. *Id.* at 680. The appellant approached the house without the shotgun and knocked on the door. *Id.* at 680. When Ms. Clark came to the door, the appellant asked if they could talk, so she led him to the kitchen. *Id.* at 736. According to Ms. Clark, the appellant smelled of alcohol, but did not seem intoxicated while they were talking. *Id.* at 735–36. He told her that he killed someone and asked her to keep the shotgun for him. *Id.* at 736. She agreed, at which point he retrieved the shotgun, re-entered the house and Ms. Clark placed the shotgun under her bed. *Id.* at 736–37. The appellant told her he would be back to retrieve the shotgun the next day. *Id.* at 737. In the meantime, LCpl Curry and LCpl Brown drove a short ways away and threw the spent shotgun shell out of the window of the car. *Id.* at 680.

LCpl Curry and LCpl Brown returned to Ms. Clark's house, picked up the appellant, and returned to Camp Lejeune. *Id.* at 680–81. Although the car was searched at the gate, the guards did not find anything and the three Marines returned to their barracks. *Id.* at 681–83. While the appellant was hiding the shotgun used to kill LCpl Page, LCpl Walker was hiding his own shotgun at his friend LCpl Levern Hayes' residence. *Id.* at 650. LCpl Walker appeared nervous and smelled of alcohol when he showed up at LCpl Hayes' house early on the morning of 27 March 1992. *Id.* at 649–50. LCpl Walker told LCpl Hayes that his friend, the appellant, had shot a "white dude" and asked if LCpl Hayes could keep his (LCpl Walker's) shotgun. *Id.* at 649–50. LCpl Hayes agreed and LCpl Walker placed the shotgun in the trunk of LCpl Hayes' car. *Id.* at 650. After hiding the weapon, LCpl Walker, LCpl McDonald and LCpl Adams returned to their barracks. *Id.* at 588–90. After getting off of work later on the 27th of March, the appellant, LCpl Walker and LCpl Brown retrieved the shotgun at Ms. Clark's house and took it to LCpl Walker's storage unit. *Id.* at 684–85. Later that same day, 27 March 1992, LCpl Walker retrieved his own shotgun from LCpl Hayes. *Id.* at 651.

### B. *Offenses committed against LCpl James*

During February and March of 1992, LCpl Walker engaged in an affair with Mrs. Victoria James, the wife of LCpl Christopher James. *Id.* at 685, 780. LCpl Walker and LCpl James were in the same unit and LCpl Walker had moved into the James' house in January at the invitation of LCpl James. *Id.* at 780. It soon became clear to LCpl Walker that LCpl James and his wife were having serious domestic difficulties. *Id.* at 629. In at least one instance, LCpl Walker witnessed LCpl James verbally and physically abuse his wife and responded with threatening behavior towards LCpl James. *Id.* at 782–85.

By late March of 1992, LCpl James had kicked LCpl Walker out of the house. *Id.* at 632, 782. It was common knowledge among the other Marines in LCpl Walker's unit that LCpl Walker was having an affair with Mrs. James. *Id.* at 593–94, 685–86. Although he denied having the affair when confronted by his chain of command, LCpl Walker told his friends in the unit that he and Mrs. James were having an affair and that he would respond with violence if confronted by LCpl James. *Id.* at 686–87, 793, 886–87. LCpl Walker and Mrs. James met with each other on the evening of 29 March 1992, renting a motel room while LCpl James was on duty. *Id.* at 789–90.

The next afternoon, the appellant, LCpl Walker, and LCpl Brown were in their barracks room when LCpl Walker told his two friends that Mrs. James wanted her husband dead. *Id.* at 686. He also mentioned that a person could have a nice life with $50,000. *Id.* at 687. Before the appellant and LCpl Walker left the barracks for the house of LCpl Adam Neikirk, USMC, another member of their unit, the appellant asked LCpl Brown for a black shirt. *Id.* at 687.

The appellant and LCpl Walker drove to LCpl Neikirk's house on Camp Lejeune in LCpl Walker's white Corsica, arriving sometime between 1745 and 1800. *Id.* at 883–84.

Having been invited into the house, LCpl Walker and LCpl Neikirk talked about an upcoming deployment and eventually began discussing guns. *Id.* at 884. The two went out to LCpl Walker's car and examined LCpl Walker's shotgun. *Id.* at 885. LCpl Neikirk declined to handle the shotgun because he saw that it was loaded. *Id.* After viewing the shotgun, the two returned to the house where LCpl Walker and the appellant used LCpl Neikirk's phone. *Id.* at 886. LCpl Neikirk heard the caller ask for "Chris" on the phone.[2] *Id.* at 886. The appellant and LCpl Walker left LCpl Neikirk's house at approximately 1830. *Id.* at 888.

At roughly 1915, LCpl James left his house, located on Camp Lejeune, and drove some friends who had joined LCpl James and Mrs. James for dinner to their home. *Id.* at 792. Shortly thereafter, LCpl Walker arrived in his car with a man whom Mrs. James was unable to identify. *Id.* at 792–93. She described him as "a medium-height black male wearing dark clothing, and he had on dark shades." *Id.* at 793. When they arrived, Mrs. James was talking on the phone to Ms. Desiree Tensley. *Id.* at 793, 856. Ms. Tensley was a friend of LCpl Walker's; she knew about the affair and had heard LCpl Walker discuss his plans to get LCpl James "out of the way." *Id.* at 853. When LCpl Walker entered the house, he took the phone from Mrs. James, realized it was his friend Ms. Tensley, and, according to Mrs. James, she heard him say "a buddy" followed by a pause and then "Parker." *Id.* at 794. However, Ms. Tensley, who remembers speaking with LCpl Walker that evening, testified that she did not remember LCpl Walker saying the words "a buddy" or "Parker." *Id.* at 856. She recalled LCpl Walker getting on the phone, telling her "it's going to happen tonight," and then hanging up. *Id.* at 856. Before he and the other man left, LCpl Walker assured Mrs. James that he would "do" LCpl James, which she understood to mean that he was going to kill LCpl James. *Id.* at 796.

LCpl Walker and the unidentified man left the James residence and moved to a pay phone down the street. *Id.* at 797. LCpl Walker called his paramour, Mrs. James, from the pay phone and told her to call around and find LCpl James. *Id.* He told her that he was not an amateur and had "done it before" on "Thursday", which she understood as a statement that he had killed someone on the prior Thursday, 26 March 1992, the day LCpl Page was killed. *Id.*

At some point during this conversation, LCpl Walker saw LCpl James return home. *Id.* LCpl Walker returned to the James house. *Id.* at 798–99. Mrs. James heard LCpl Walker and saw the unidentified African–American male in the hallway with her husband. *Id.* at 842–44. Having joked around with LCpl Walker and the third man, LCpl James came in and told her that he was going to a barracks "get-together." *Id.* at 799. All three men left the house and Mrs. James saw both her husband's car and LCpl Walker's car drive away. *Id.* At about 2100 that night, LCpl Walker called Mrs. James and told her that LCpl James had been shot in the stomach and that "his buddy had done it." *Id.* at 800.

At approximately 2010, Sergeant (Sgt) Edward Bodge, USMC, heard a loud noise, "like a car backfiring," while he was getting his mail near his home on Camp Lejeune. *Id.* at 900–01. Looking in the general direction of the noise, he saw a set of tail-lights in a wooded area. *Id.* at 901. The car, a white Chevrolet Corsica, seemed suspicious as it backed out of the woods, prompting Sgt Bodge to follow it in his own vehicle and record the license plate as "MRS W 4." *Id.* at 901–03; PE 72. He pulled up alongside the vehicle and saw two African–American men with Marine-style haircuts in the vehicle. Record at 903–04. After running some errands, he returned home to find his street cordoned off and the military police investigating a shooting. *Id.* at 905. Sgt Bodge told the authorities what he had heard and observed. *Id.*

2. LCpl Neikirk testified that, to the best of his knowledge, it was the appellant that made the call. Mrs. James remembered talking with LCpl Walker on the phone rather than the appellant before LCpl Walker came over to her house on the evening of 30 March 1992. Record at 792.

The loud noise Sgt Bodge heard was corroborated by Mr. Scott Bryan, who was near the same wooded area at roughly 2010 on 30 March 1992 and heard what he identified as the sound of a 12-gauge shotgun. *Id.* at 918–19. He exited a friend's home to investigate and saw a white Chevrolet Corsica driving away. *Id.* at 920–21. When he walked over to the wooded area where he thought the sound came from, Mr. Bryan found the body of LCpl James. *Id.* at 922–23; PE 52. He immediately had his wife contact the authorities. Record at 923.

Sometime between 2030 and 2045, LCpl Walker and the appellant arrived at Mr. Anthony Davis' house in the city of Jacksonville, roughly a twenty-minute drive from the area on Camp Lejeune where the body of LCpl James was discovered. *Id.* at 941, 959. Mr. Davis was unhappy that LCpl Walker and the appellant appeared on his doorstep at that time of night and said "[y]ou guys can get shot coming to my house this time of night." *Id.* at 941. LCpl Walker replied "I already came close to death twice already [sic]." *Id.* According to Mr. Davis, the appellant was wearing a light blue shirt. *Id.* at 957. LCpl Walker asked Mr. Davis several times to allow him to store his car at Mr. Davis' house, even though Mr. Davis had already refused him. *Id.* at 941–42. Mr. Davis again refused and LCpl Walker then asked if he could make a phone call. *Id.* at 944. Mr. Davis testified that at some point that evening LCpl Walker finished using the phone and then went outside to his car. *Id.* at 953. He came back in, used the phone again, and at roughly 2100, LCpl Walker and the appellant left Mr. Davis' house.[3] *Id.* at 954.

LCpl Walker and the appellant drove to Mr. Phillip Sartor's house, also in Jacksonville and about twenty minutes by car from Mr. Davis' house. *Id.* at 955, 962–63. When they arrived, Mr. Sartor was on the phone with Mr. Davis, who had called Mr. Sartor to discuss LCpl Walker and the appellant. *Id.* at 955, 962–63. Mr. Sartor testified that LCpl Walker and the appellant arrived at his house between 2030 and 2100. *Id.* at 962–63. Earlier in the day Mr. Sartor had agreed to store LCpl Walker's car. *Id.* at 961–62. According to Mr. Sartor, the appellant was wearing a white shirt with a picture of Malcolm X on it. *Id.* at 970–71. LCpl Walker asked to use Mr. Sartor's phone.[4] *Id.* at 963.

Having used the phone, LCpl Walker then asked for a rag and with the appellant spent several minutes wiping down his car. *Id.* at 964. He gave his keys to Mr. Sartor's wife for safekeeping and LCpl Walker and the appellant got in Mr. Sartor's car for a ride back to the base. *Id.* at 965. As the vehicle backed up, LCpl Walker asked for the keys back and began to scrub down the rear bumper of his car. *Id.* at 965–66. Now finished, LCpl Walker again gave the keys to Mrs. Sartor and rode with Mr. Sartor and the appellant back onto Camp Lejeune. *Id.* at 966. During the car ride, LCpl Walker asked the appellant "Flav (the appellant's nickname), did I close my storage area?" *Id.* at 976. The appellant answered "[y]eah man." *Id.* As Mr. Sartor dropped LCpl Walker and the appellant off at the barracks, LCpl Walker said "Sartor, anybody asks you, we've been with you all day." *Id.* at 967.

LCpl Walker and the appellant were seen on base laughing and joking around 2300. *Id.* at 598. At the same time, the authorities had begun to investigate the LCpl James murder and arrested LCpl Walker and the appellant at their barracks shortly after 0100. *Id.* at 1017. Within days, the authorities discovered LCpl Walker's storage bin, obtained a search warrant, and performed a search. *Id.* at 1021–22. They found both LCpl Walker's shotgun and LCpl Brown's shotgun. *Id.* at 1023–24; PE 30 and 32.

---

3. As mentioned, Mrs. James received a call from LCpl Walker around 2100 in which he told her that LCpl James had been killed and that his "buddy" had done it. Record at 800. LCpl Walker also called LCpl McDonald at approximately 2100 telling him "it's done." *Id.* at 597. He contacted Mrs. James again a short time later and asked her whether the authorities had contacted her. *Id.* at 801.

4. Ms. Tensley testified that she received a call from LCpl Walker between 2130 and 2200 that night in which LCpl Walker told her "it's done", which she took to mean the murder of LCpl James. Record at 857. He also told her that his shotgun was not with him. *Id.* at 858.

Additionally, a spent shotgun shell was found in LCpl Walker's shotgun. Record at 1024; PE 33, 137. This shell was manufactured by the Remington Company and contained two and three-quarter inch .000 buckshot. Record at 1082. The shotgun pellets removed from LCpl James's body were also .000 buckshot and were very similar to the buckshot contained in a live shotgun shell also found in LCpl Walker's storage bin. Record at 1097–98; PE 63, 68, 113.

Having considered the pleadings, the record of trial, and oral argument, we set aside the appellant's convictions for the murder, conspiracy to commit murder and kidnapping, kidnapping, and orders violation related to the killing of LCpl James and dismiss those specifications. Additionally, we set aside the kidnapping conviction related to the killing of LCpl Page.

## II. Severance and Spillover

In his first assignment of error (AOE), the appellant asserts that he suffered prejudice when the trial judge refused to sever the charges stemming from the murder of LCpl Page from those associated with the murder of LCpl James.[5] In short, the appellant contends that there was no factual nexus between the two murders that would permit the same jury to hear both cases. Furthermore, the appellant argues in his second AOE that the trial judge, in the face of a recommendation to the contrary from the Government, failed to give the members a spillover instruction, despite allowing substantial spillover between the facts and evidence associated with the two murders.[6]

The CAAF has noted that "federal courts, both military and civilian, have been concerned with preventing impermissible spillover in various ways from the proof of one offense into the trial of another offense." *United States v. Duncan*, 53 M.J. 494, 497 (C.A.A.F.2000) (citations omitted). Military jurisprudence favors the adjudication of all

charges known to the Government at one trial. RULE FOR COURTS–MARTIAL 601(e)(2), MANUAL FOR COURTS–MARTIAL, UNITED STATES, 1984. R.C.M. 906(b)(10) is an exception to this norm and allows severance of offenses to prevent "manifest injustice." The appellant asserts that, due to the admitted magnitude of his guilt in the LCpl Page killing, the members were faced with an impossible situation in which they could not hold the Government to its full burden of proof as to the LCpl James killing. This risk of spillover, the appellant asserts, was especially dangerous in a case where the death penalty was authorized and the appellant's culpability was far less clear for one of the two killings. We agree.

■ In reaching our conclusion that the trial judge erred to the material prejudice of the appellant's substantial rights in failing to sever the LCpl Page and LCpl James killings into two trials or, in the alternative, by failing to instruct the members on spillover and its inherent dangers, we comport ourselves with that precedent which dictates that the trial court should only grant severance "to prevent manifest injustice." *United States v. Simpson*, 56 M.J. 462, 464 (C.A.A.F. 2002) (quoting R.C.M. 906(b)(10)).

"An abuse of discretion will be found only where the defendant is able to show that the denial of a severance caused him actual prejudice in that it prevented him from receiving a fair trial; it is not enough that separate trials may have provided him with a better opportunity for an acquittal."

*Id.* (quoting *Duncan*, 53 M.J. at 497–98). In order to establish whether the denial of severance has "failed to prevent a manifest injustice and denied ... a fair trial," we apply the three pronged test established in *United States v. Southworth*, 50 M.J. 74, 76 (C.A.A.F.1999). *Id.* This test asks: (1) whether the evidence of one offense would be

---

5. AOE I. A DANGEROUS SPILLOVER EFFECT PREJUDICED APPELLANT WHEN THE CHARGES AND SPECIFICATIONS FOR THE 26 MARCH 1992 MURDER OF LCPL RODNEY PAGE AND THE CHARGES AND SPECIFICATIONS FOR THE 30 MARCH 1992 MURDER OF LCPL CHRISTOPHER JAMES WERE MERGED AT A SINGLE COURT–MARTIAL.

6. AOE II. THE MILITARY JUDGE COMMITTED PLAIN ERROR BY FAILING TO GIVE A SPILLOVER INSTRUCTION *SUA SPONTE*, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH AND EIGHT AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 55, UCMJ.

admissible proof of the other; (2) whether the trial judge has provided a proper limiting instruction; and (3) whether the findings reflect an impermissible crossover. *Southworth*, 50 M.J. at 76.

■ We first examine "whether the evidence of one offense would be admissible proof of the other." *Id.* Although the Government linked the two murders together in its theory of the case, the two killings were actually quite distinct from each other. In the first instance, the murder of LCpl Page was nothing more than a premeditated determination by a number of co-conspirators to kill an individual at random, based exclusively upon his race. In sharp contrast, the killing of LCpl James by LCpl Walker and an unidentified co-conspirator was the tragic *denouement* of an illicit affair between LCpl Walker and his victim's willing and possibly complicit spouse. The Government's case theory, manifested in both pretrial briefs and outlined with great clarity during its opening statement, closing arguments, and examination of witnesses, posited that the first murder was integrally connected to the second. In fact, in its opposition to the defense motion to sever, the Government went so far as to describe the first killing as nothing short of a testing ground for the LCpl James murder, asserting that the appellant proved his killing *bona fides* to LCpl Walker, who "realized that he could easily incite and encourage the accused to commit murder for little or no reason at all." Appellate Exhibit XXX at 6.

Although the Government somewhat overstated the facts in support of their theory of recruitment, we note that it is entirely plausible that LCpl Walker actually did recruit the appellant to help him kill LCpl James.[7] However, given the significant differences between the two killings, we have serious reservations as to whether evidence of the

LCpl Page murder would have been admissible to prove the LCpl James murder.

The second *Southworth* factor asks whether "the military judge has provided a proper limiting instruction." 50 M.J. at 76. In this case he did not, despite the Government's position in its opposition to the defense motion to sever that a spillover instruction was required should severance be denied:

> Finally, any danger of "prejudicial spillover" that may exist as a result of trying The Page Murder Charges and The James Murder Charges at the same court-martial will be prevented with a simple limiting instruction. *See [United States v.] Haye*, 29 M.J. [213,] at 214 [ (C.M.A.1989) ] ("spillover may be compensated for by adequate limiting instructions to the members admonishing them not to merge evidence"). A simple limiting instruction can also be given to prevent the members from drawing any improper conclusions should the accused choose to testify as to one murder but remain silent as to the other.

AE XXX at 8. Likewise, in arguing before the trial judge, trial counsel stated:

> And again, sir, members can follow limiting instructions and the government submits that the military judge can give sufficient limiting instructions to prevent any manifest injustice, any unfair spill over [sic] or unfair inferences that may be caused by trying these two murders together in the same court-martial.

Record at 72. Regrettably, after denying the defense motion to sever, the trial judge failed to instruct the members on spillover.

With grave concerns regarding the first two *Southworth* factors, we turn to the third factor, which asks whether "the findings reflect an impermissible crossover." 50 M.J. at 76. The record does not reflect impermissi-

---

7. At times this effort even countenances exaggerations of the truth, such as the assertion by the Government within their response to the severance motion below that LCpl Walker and the appellant moved the LCpl Page murder weapon. The brief chooses to omit the undisputed fact that the idea to move the weapon was not the appellant's, and he was not a primary player in the evolution. As one of the co-conspirators in the LCpl Page killing, LCpl Brown testified: "I had talked to [LCpl] Walker to let me keep it into his—let me keep it in his storage [unit] that he had out in town." Record at 684. This information was well-known to the Government, as they had statements from most of the co-conspirators to the LCpl Page killing and were engaging in the negotiation of pretrial agreements with all co-conspirators save LCpl Walker and the appellant at the time the motion to sever was heard.

ble crossover. However, given the serious questions regarding the first two *Southworth* factors, particularly the trial judge's failure to give a spillover instruction to the members, we hold that the trial judge abused his discretion by failing to sever the LCpl Page murder from the LCpl James murder. *Simpson*, 56 M.J. at 465. Given the strength of the Government's case as to the murder of LCpl Page and the circumstantial nature of the case as to the LCpl James murder, we find that the findings of guilty to the offenses related to the LCpl James murder were impacted by this abuse of discretion. If this were the only error in this case, in our decretal paragraph we would set aside the findings of guilty for the murder of LCpl James, as well as his convictions for those crimes associated with the LCpl James killing (conspiracy to kidnap and murder, violation of a lawful general order, and kidnapping) [8] and authorize a rehearing as to those offenses.

### III. Legal and Factual Sufficiency

We next address the legal and factual sufficiency of the appellant's convictions for the premeditated murder of LCpl Page and LCpl James.[9] Pursuant to Article 66(c), UCMJ, we review *de novo* each conviction for legal and factual sufficiency. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F.2002). A conviction is legally sufficient if, "considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could find all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324–25 (C.M.A.1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). A conviction is factually sufficient if, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt.

*Id.* at 325. We are convinced that the appellant's conviction for the murder of LCpl Page is legally and factually sufficient beyond a reasonable doubt.

### A. The premeditated murder of LCpl Page

■ At trial, the appellant did not contest that he shot LCpl Page. Rather, he argued that the shooting was not premeditated because, due to alcohol consumption, a lack of mental capacity, or both, he was unable to form the specific intent required to satisfy the elements of premeditated murder. Record at 494–97, 1401–03. Premeditation is defined as:

> [M]urder committed after the formation of a specific intent to kill someone and consideration of the act intended. It is not necessary that the intention to kill have been entertained for any particular or considerable length of time.... The existence of premeditation may be inferred from the circumstances.

MANUAL FOR COURTS–MARTIAL, UNITED STATES, 1984, Part IV, ¶ 43c(2)(a).[10] In this case, we are convinced beyond a reasonable doubt that the appellant was able to form the requisite "premeditated design to kill" LCpl Page despite his assertions of mental incapacity and intoxication.

Fundamentally, an accused is presumed to be mentally competent. *United States v. Shaw*, 64 M.J. 460, 463 n. 3 (C.A.A.F.2007) (citing R.C.M. 916(k)(3)(A)). Mental incapacitation is an affirmative defense in military jurisprudence that must be established by clear and convincing evidence. *United States v. Riddle*, 67 M.J. 335, 338 (C.A.A.F. 2009) (citing Art. 50a(a), UCMJ). The burden is on the defense to establish that the accused suffered from a "severe mental disease or defect" and, consequently, was "unable to appreciate the nature and quality or the

---

**8.** Charge III, Specification 3; Charge I, Specification 2; Charge II, Specification 2; Charge V, Specification 2.

**9.** AOE VII. THE EVIDENCE WAS LEGALLY AND FACTUALLY INSUFFICIENT TO SUSTAIN APPELLANT'S CONVICTION FOR THE PREMEDITATED MURDER OF LCPL PAGE.
 AOE VIII. THE EVIDENCE WAS LEGALLY AND FACTUALLY INSUFFICIENT TO SUSTAIN

APPELLANT'S CONVICTION FOR THE PREMEDITATED MURDER OF LCPL CHRISTOPHER JAMES.

**10.** This language has been included verbatim in subsequent Manuals, including the most recent versions. *See e.g.* MCM (2008 and 2012 eds.), Part IV, ¶ 43c(2)(a).

wrongfulness of the act." *United States v. Martin*, 56 M.J. 97, 99 (C.A.A.F.2001) (quoting Art. 50a(a), UCMJ). In response to this defense, the Government is free to offer rebuttal evidence to show that the accused was "mentally responsible at specific times during the time period in question." *Id.*

Applying the factual sufficiency standard to the question of mental competency, we find that the appellant failed to establish by clear and convincing evidence that he was mentally incompetent. Similarly, viewing the evidence in the light most favorable to the Government, as required when weighing legal sufficiency, we find that a reasonable fact-finder could have found that the appellant failed to establish his mental incompetency by clear and convincing evidence. Although the appellant presented expert testimony that he was mentally incompetent when he shot LCpl Page on 26 March 1992, the prosecution rebutted this expert testimony with expert testimony of its own, along with critical facts from before, during, and after the shooting.

In support of his theory of mental incompetency, the appellant at trial presented the testimony of Dr. Antonio Puente, Ph.D., an expert in neuropsychology. Record at 1297, 1301. Dr. Puente testified that the appellant had an IQ of 74 and functioned at the intellectual level of a 15–year-old. *Id.* at 1305–06; Defense Exhibit I at 7–8. He further testified that the appellant's problem-solving ability was commensurate with someone with brain damage and organic personality disorder. Record at 1307, 1309. When combined with a high level of intoxication, this meant, according to Dr. Puente, that the appellant was unable to appreciate the nature, quality, or consequences of his acts and was unable to appreciate the wrongfulness of his conduct. *Id.* at 1312–13. Finally, Dr. Puente testified that the formulation of a simple plan to find and kill a person did not alter his opinion that the appellant lacked mental responsibility. *Id.* at 1321, 1326–27.

In rebuttal, the Government called Commander (CDR) Sandra Yerkes, Medical Corps, USN, a board certified Navy psychiatrist. CDR Yerkes opined that, having interviewed the appellant and reviewed relevant documents and records, she did not believe the appellant suffered from a mental defect or mental incompetency.[11] *Id.* at 1344. Rather, she testified that the appellant "had a clinical diagnosis of an adjustment disorder with depressed mood ... that he had a polysubstance abuse history which was in remission ... that he had a significant history of alcohol use which I felt was equivalent to be an alcohol dependent; and that he had an antisocial personality disorder." *Id.* at 1344–45. She based this opinion on her evaluation of the appellant, as well as the appellant's actions on the night of the LCpl Page murder. *Id.* at 1344, 1348–49.

Having reviewed the record and considered the opinions of the respective experts, we conclude that when the appellant killed LCpl Page he was not suffering from a "severe mental disease or defect" which resulted in his being "unable to appreciate the nature and quality or the wrongfulness" of his acts. *Martin*, 56 M.J. at 99 (quoting Art. 50, UCMJ). Supporting this determination are the appellant's statements and actions before and after the LCpl Page murder. Having listened to his friends discuss racial tensions within their unit and on Camp Lejeune, he said "[w]e are going to get us a white boy tonight." Record at 556, 663. He told the group prior to the murder "No, it can be done right here in Jacksonville. Who is going to find out?" *Id.* at 565. He expressed satisfaction that the group was finally "putting its words into action." *Id.* at 722. When he saw LCpl Page walking down the side of the road he said "[t]hat's the one we are getting tonight." *Id.* at 671–72. After exiting the car, he told LCpl Curry and LCpl Brown to meet him at a stop light. *Id.* at 672. Having shot LCpl Page, the appellant was cognizant enough of what he had done to want to avoid the police as well as suggest that they hide the murder weapon with his girlfriend, Ms. Omega Clark. The appellant discussed the trustworthiness of his girl-

---

11. CDR Yerkes was also one of the two doctors who performed, prior to trial, the R.C.M. 706 Board that found the appellant mentally competent and able to "understand the nature of the proceedings and to cooperate intelligently in his defense." PE 143 at 8.

friend with his co-conspirators and made plans with her to pick up the shotgun from her home the next day. *Id.* at 675–79, 736–37. The appellant was able to recount the murder a short time afterwards to his friends—in macabre detail. *Id.* at 585, 674. Finally, the appellant was able to modify his behavior so as to avoid detection when returning to Camp Lejeune. *Id.* at 681–83.

This outline of the appellant's words and actions clearly demonstrates that he was mentally competent at the time of his murderous act. Although Dr. Puente and CDR Yerkes reached diametrically opposed conclusions regarding the appellant's mental responsibility, the members were free to believe the testimony they found most helpful and credible as they weighed the evidence before them. *United States v. Redmond,* 21 M.J. 319, 325 (C.M.A.1986). We find that the appellant's behavior, although characterized by defense experts as indicative of incompetency, in fact establishes that the appellant was mentally competent on the night of the LCpl Page murder. In short, the appellant failed to prove by clear and convincing evidence that he was not mentally responsible. *Martin,* 56 M.J. at 99. Similarly, a reasonable fact-finder could have concluded that the appellant failed to prove a lack of mental responsibility by clear and convincing evidence. *Id.*

Even if an accused is deemed mentally competent, the Government must still prove every element of an offense, including the *mens rea. United States v. Berri,* 33 M.J. 337, 342 (C.M.A.1991). In this case, the appellant argues that, even if he was mentally responsible in general, he was unable to form the requisite specific intent for premeditated murder because he suffered from "brain damage, borderline mental retardation, and intoxication." [12] Appellant's Brief of 20 Oct 2011 at 81. Having concluded that the appellant was mentally competent on the night of 26 March 1992, we also conclude that he was able to form the specific intent required for premeditated murder. His actions, including planning, executing, and covering up LCpl Page's murder, not to mention recounting the events to his friends, show an ability to form specific intent and thus murder with premeditation.

Similarly, we are convinced beyond any reasonable doubt that the appellant was not intoxicated to the point where he was unable to premeditate. It is clear from the record that the appellant had been drinking prior to LCpl Page's murder. Record at 550–51. However, the exact amount of alcohol the appellant consumed was in dispute during the trial. According to Dr. Gary Whitlock, M.D., a substance abuse expert called by the defense, the appellant had a blood-alcohol level of .40, an extremely high concentration. *Id.* at 1244. This testimony was largely rebutted by testimony that the appellant exhibited few signs of intoxication during the events leading up to, during, and after the LCpl Page murder. The appellant did not appear to slur his speech or stumble. He was able to make plans and follow through with those plans. To several witnesses, the appellant did not appear intoxicated. He was able to wake up and go to work on-time the next morning. Dr. Whitlock's testimony, which was based on the appellant's version of events, strains credulity in the face of the evidence presented at trial regarding the appellant's behavior. We are convinced beyond a reasonable doubt that the appellant was not intoxicated to the point where he was unable to form the specific intent to murder LCpl Page.

Considering the appellant's actions on the night he killed LCpl Page, we are convinced beyond a reasonable doubt that the appellant was mentally responsible. He was not suffering from a mental defect or otherwise mentally incompetent such that he was generally not accountable for his actions. Similarly, he was able to form the specific intent required to premeditate, his assertions of intoxication and mental deficiency notwith-

**12.** Although partial mental responsibility is generally not a defense under R.C.M. 916(k)(2), a 2004 Amendment to this Rule added a discussion section that summarizes this theory as applied to state of mind: "Evidence of a mental condition not amounting to a lack of mental responsibility may be admissible as to whether the accused entertained a state of mind necessary to be proven as an element of the offense." R.C.M. 916(k)(2), (2005 ed.), Discussion. *See also United States v. Mansfield,* 24 M.J. 611, 615 (A.F.C.M.R.1987).

standing. As such, we affirm the appellant's conviction for the premeditated murder of LCpl Page.

B. *The premeditated murder of LCpl James*

■ While the evidence supporting the appellant's conviction for the premeditated murder of LCpl Page was overwhelming, the same cannot be said of the evidence supporting the appellant's conviction for the LCpl James murder. Having weighed the evidence in the record of trial and made allowances for not having personally observed the witnesses, we are not convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325.

Our analysis of the factual basis for the LCpl James murder conviction must start with both a determination of what evidence was considered by the members and a determination of what evidence was properly considered by the members. The Government's evidence supporting the appellant's conviction for the LCpl James murder was based on circumstantial evidence. Although circumstantial evidence can certainly be the basis for a conviction, in this case the circumstantial evidence presented belied a distinct lack of overall evidence supporting the appellant's conviction for the LCpl James murder.

Considering the facts presented at trial, it is clear that the appellant was seen with his friend LCpl Walker, a man with a motive and means to kill LCpl James, both before and after the murder. What is unclear, however, is whether the appellant was with LCpl Walker immediately before, during, and immediately after LCpl James was killed. The last positive identification of the appellant with LCpl Walker prior to LCpl James' murder was by LCpl Neikirk at approximately 1830. Record at 888. Later that evening, Mrs. Victoria James was unable to positively identify the man who accompanied LCpl Walker to her house, although LCpl Walker and the unidentified man visited her twice within an hour. Additionally, her testimony that LCpl Walker said "Parker" while on the phone was contradicted by Ms. Tensley. Sgt Bodge testified that he heard a loud noise, like a car backfiring, around 2010, saw LCpl Walker's car fleeing the scene and, having caught up with LCpl Walker's car at an intersection, saw two African–American men with Marine-style haircuts in the car. However, he was unable to positively identify either man. The first positive identification of LCpl Walker and the appellant together was sometime between 2030 and 2045, when they arrived at Mr. Davis' house in LCpl Walker's car.

This circumstantial evidence was buttressed by hearsay implicating the appellant. However, given that this is our initial Article 66(c), UCMJ, review, the appellant gets the benefit of intervening case law. As such, portions of the hearsay implicating the appellant cannot be considered in our factual sufficiency review, given that they would not be properly admitted under current law. *See United States v. Clark*, 61 M.J. 707, 713 (N.M.Ct.Crim.App.2005) (once object of a conspiracy accomplished, conspiracy terminates and further statements by conspirators may not be admitted under MILITARY RULE OF EVIDENCE 802(d)(2)(E), MANUAL FOR COURTS–MARTIAL, UNITED STATES (1998 ed.)). LCpl Walker's statement to Mrs. James that "his buddy had done it" fits squarely within this rule, as does LCpl Walker's statement to Mr. Davis that he "already came close to death twice already [sic]." These statements were critical pieces of the Government's case. Removing them from our factual sufficiency calculus raises serious questions regarding the evidentiary basis for the appellant's conviction for the premeditated murder of LCpl James.

We also note that evidence of LCpl Walker's guilt was far more prevalent during the trial compared to evidence of the appellant's guilt. LCpl Walker made several self-incriminating statements the night of the murder, telling Mrs. James that he would kill LCpl James and that he had killed before. He also made a similar statement to Ms. Tensley. Record at 856. Additionally, the forensic evidence tied LCpl Walker closely to the murder. His shotgun was stored in his locker and contained a shell that was very similar to the shell used to kill LCpl James. Additionally, blood and clothing fibers from LCpl James were found on LCpl Walker's

car. Finally, LCpl Walker had a strong motive to kill LCpl James, a motive he repeatedly expressed to his friends.

It is clear that the appellant was friends with LCpl Walker. It is also clear that he killed LCpl Page and was with LCpl Walker on the night of LCpl James' murder. However, without more, the circumstantial evidence placing the appellant with LCpl Walker that night cannot support a determination that the appellant killed LCpl James beyond a reasonable doubt. In a civil court, with a lesser burden of proof, the appellant might be found liable. However, the beyond a reasonable doubt standard is a strict burden. Based on the evidence properly before us and our mandate to review the factual sufficiency of all cases properly before us under Article 66(c), UCMJ, we are not convinced beyond a reasonable doubt that the appellant murdered LCpl James. As such, in our decretal paragraph we will set aside the findings of guilty for the murder of LCpl James, as well as the attendant convictions for conspiracy to kidnap and murder LCpl James, possessing an unregistered firearm on base, and kidnapping, and dismiss those specifications.[13]

C. *The robbery of and conspiracy to murder and rob LCpl Page, and related orders violation* [14]

■ Per our discussion of the appellant's mental capacity and intoxication in relation to the premeditated murder of LCpl Page, *supra*, we hold that the appellant was mentally responsible and able to form the specific intent required to rob LCpl Page.[15] Additionally, we hold that his attendant convictions related to the LCpl Page murder, including the conspiracy to murder and rob LCpl Page, and the orders violation, are legally and factually sufficient.[16]

## IV. Evidentiary Issues

A. *Improperly admitted prior acts testimony* [17]

At trial, the Government was burdened by a lack of direct evidence demonstrating that the appellant participated in, let alone actually caused, the death of LCpl James. The Government compensated for this absence of direct evidence through two modes: the admission of hearsay testimony from co-conspirators which the evolution of case law now precludes, *Clark*, 61 M.J. at 713, and the introduction of prior "bad acts" under MIL. R. EVID. 404(b). Having considered the hearsay issue, *supra*, we turn to the MIL. R. EVID. 404(b) issue. The law is clear that the Government can only admit evidence of "other crimes, wrongs, or acts" as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" and only if they provide the defense with reasonable notice before trial. MIL. R. EVID. 404(b). The most damaging material admitted under this rule by the court below, without an attending limiting instruction, related to the statements made by the appellant relative to his involvement

---

**13.** Specification 3 of Charge III; Specification 2 of Charge I; Specification 2 of Charge II; and Specification 2 of Charge IV, respectively.

**14.** AOE CXVI. THERE WAS INSUFFICIENT EVIDENCE TO CONVICT APPELLANT OF CHARGE IV AND ITS SPECIFICATION (ROBBERY OF LCPL PAGE): (1) APPELLANT WAS NOT MENTALLY RESPONSIBLE FOR HIS ACTIONS ON 26 MARCH 1992; AND (2) APPELLANT WAS INCAPABLE, DUE TO INTOXICATION AND/OR DIMINISHED MENTAL CAPACITY, OF FORMING THE SPECIFIC INTENT TO PERMANENTLY DEPRIVE LCPL PAGE OF THE USE AND BENEFIT OF HIS WALLET. (Citation omitted).

**15.** Charge IV, Specification.

**16.** Charge I, Specification 1; Charge II, Specification 1.

**17.** AOE III. APPELLANT WAS PREJUDICED WHEN THE MILITARY JUDGE ALLOWED TESTIMONY THAT APPELLANT CLAIMED TO HAVE SHOT AN AK–47 AT A PASSING CAR IN PHILADELPHIA AND THAT APPELLANT WAS OBSESSED WITH DRIVE–BY SHOOTINGS INTO EVIDENCE OVER APPELLANT'S OBJECTIONS.

AOE CIX. THE MILITARY JUDGE COMMITTED PLAIN ERROR BY ALLOWING LCPL BROWN TO TESTIFY THAT SHORTLY AFTER [LCPL] PAGE WAS SHOT THE APPELLANT SAID "GET ME OUT OF HERE. I NEVER DID A WHITE BOY. I DID A BLACK DUDE, BUT NEVER A WHITE BOY. GET ME OUT OF HERE." (Citations omitted).

in an alleged drive-by shooting in Philadelphia while utilizing an AK–47 assault rifle.

■ It is settled law that "an accused may not be convicted of a crime based on a general criminal disposition." *United States v. Burton*, 67 M.J. 150, 152 (C.A.A.F.2009) (citations omitted). As stated above, MIL. R. EVID. 404(b) offers the Government limited avenues through which it can admit evidence such as the alleged incident at bar. The use of such evidence is strictly limited and must enjoy a relevant nexus with the offenses of which the accused is charged. We review a trial judge's ruling to admit or reject evidence for an abuse of discretion. *United States v. Grant*, 56 M.J. 410, 413 (C.A.A.F. 2002). In determining the propriety of the admission of uncharged misconduct evidence, we employ the three pronged test of *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989): (1) Does the evidence reasonably support a finding by the court members that the appellant committed the prior crimes, wrongs or acts?; (2) What fact of consequence is made more or less probable by the existence of the evidence?; and (3) Is the probative value of the evidence substantially outweighed by the danger of unfair prejudice? The evidence has been impermissibly admitted if it fails any one of the three prongs. *United States v. Humpherys*, 57 M.J. 83, 91 (C.A.A.F.2002) (quoting *United States v. Cousins*, 35 M.J. 70, 74 (C.M.A.1992)).

■ We begin our inquiry under the first *Reynolds* prong, asking whether the fact finder "could reasonably find by a preponderance of the evidence that the misconduct occurred"—in this case, that the appellant participated in a shooting at an earlier period of his life by firing an AK–47 assault rifle into a passing car. *United States v. Hays*, 62 M.J. 158, 164 (C.A.A.F.2005). During the Government's case, Mr. Frank Hall testified regarding the appellant's infatuation with drive-by shootings:

Q: Did he tell you whether he fired his guns?

A: Yes, he did.

Q: What did he say?

A: He was in Philly one time, and he fired it on a corner one time at a car driving by, yes.

Q: Told you he fired his guns while he was home in Philly?

A: Yes. When he was—some guys drove by him and he fired it at the car as they drove by.

Q: Lance Corporal Parker told you that?

A: Yeah.

Q: What kind of gun was this?

A: At the time this was the AK–47.

Record at 988.

The trial judge also questioned Mr. Hall in front of the members, asking:

Q: Mr. Hall, did you believe Parker when he said he had shot at a car in Philadelphia driving by?

A: Yes I did.

*Id.* at 992.

Based on this testimony, the members could have concluded that the appellant fired an AK–47 at a passing car. However, it is important to note that Mr. Hall did not actually see the AK–47, but rather only saw what he was told was an AK–47 in a seabag. *Id.* at 992–93. Furthermore, Mr. Hall was not actually at the scene of the alleged shooting in Philadelphia, but rather heard of it during a bragging session in the barracks months before the LCpl James murder. *Id.* at 992. This information was received within a setting whereby several members of the appellant's unit were known by Mr. Hall to discuss drive by shootings. *Id.* at 991. Nevertheless, giving the MIL. R. EVID. 404(b) evidence our most liberal interpretation—and straining credulity to some degree—we can conclude that reasonable members could have concluded that the appellant fired an AK–47 as described to the court below. We hasten to point out that it is just as likely that reasonable members would have concluded that the description stands as mere bravado and never took place.

The second *Reynolds* factor asks what fact of consequence is made more or less probable by the existence of the evidence. 29 M.J. at 109. In making this determination, we examine the fundamental question of what, if

any, nexus exists between the alleged conduct and the charged offenses. As noted extensively above, the appellant was charged with premeditated murder and attendant felonies, including kidnapping, of two individuals on different dates. Both individuals were murdered as a result of a single shotgun blast at close quarters. Neither of the victims was alleged to be situated within a vehicle at the time of the killing. Additionally, the LCpl Page murder is an obvious instance of an intended, premeditated murder with race as the primary motive. The LCpl James killing was intended to eliminate a romantic rival—the husband of LCpl Walker's paramour. The supposed drive-by shooting described to the jury by Mr. Hall was, to the degree that the scanty facts surrounding its occurrence inform us, an incredibly violent act directed at an unspecified target—a classic drive-by shooting. These are three very different felonious scenarios which do not inform each other.

It is clear from the record that in advancing the AK–47 related testimony at trial, the sole permissible avenue under MIL. R. EVID. 404(b) lay with the issue of identification. Somehow, the Government determined that the issue of identity, which was hotly contested relative to the killing of LCpl James, would be buttressed by the members hearing testimony from Mr. Hall as to the appellant's infatuation with drive-by shootings. Record at 990–91. Essentially, the Government's argument amounted to propensity evidence: because the appellant had shot at a passing car in Philadelphia prior to the LCpl Page and LCpl James murders, he was the type of person that LCpl Walker would recruit to kill LCpl James. We reject this argument as improper under MIL. R. EVID. 404(b). Furthermore, Mr. Hall's testimony did not make it more or less likely that the appellant shot LCpl James, whether that testimony was used to identify the appellant or to show intent. As such, we resolve the second *Reynolds* prong in the appellant's favor.

Finally, we conclude without effort that the trial judge failed to satisfy the third prong of the *Reynolds* test in failing to undertake a balancing test as required by MIL. R. EVID. 403. Indeed, there is simply no evidence in the record to illustrate that the trial judge ever considered whether the evidence was substantially more prejudicial than probative—thus requiring exclusion. *Old Chief v. United States,* 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).

█ Having found that the trial judge erred in admitting the AK–47 episode to the members for consideration, and further finding that this error constituted an abuse of discretion, we turn to the issue of prejudice. As we found when examining the issues of severance and spillover, we again conclude that this is a tale of two very different cases and thus, the impact upon the members of this improper form of evidence varied depending upon the allegation. The LCpl Page murder was brought to the members with overwhelming evidence of the appellant's guilt and more than a tacit admission to homicide by the defense team in its opening statement. Record at 494. The fact that the appellant killed LCpl Page was never in question. The defense did contest the appellant's level of intent when he killed LCpl Page and contested his level of mental responsibility. In striking contrast, the LCpl James murder was hotly contested. The appellant contended he was not at the scene and there was no direct evidence placing him at the scene of the crime. The Government's case was dependent upon circumstantial evidence and of greater importance, evidence admitted per MIL. R. EVID. 404(b). In view of the overwhelming evidence of culpability as to the LCpl Page murder, we find no prejudice in the trial judge's abuse of discretion as to the drive-by shooting account which was admitted to the members. The same cannot be said of the impact this highly inflammatory evidence had upon the LCpl James related convictions. We find that the material admitted by the trial judge under MIL. R. EVID. 404(b), without a balancing test for prejudice having been undertaken and without the aid of limiting instruction to the members, prejudiced the appellant as to the LCpl James murder. If this were the only error in this case, in our decretal paragraph we would set aside the findings of guilty for the murder of LCpl James, as well as his convictions for those crimes associated

with the LCpl James killing (conspiracy to kidnap and murder, violation of a lawful general order, and kidnapping) [18] and authorize a rehearing as to those offenses.

B. *Improperly admitted interview testimony* [19]

"The fact that the accused during official questioning and in exercise of rights under the Fifth Amendment to the Constitution of the United States or Article 31 [UCMJ], remained silent, refused to answer a certain question, requested counsel, or requested that the questioning be terminated is inadmissible against the accused." MIL. R. EVID. 301(f)(3). As such, "[t]he law generally discourages trial counsel's presentation of testimony or argument mentioning an accused's invocation of his constitutional rights. . . . ." *United States v. Moran,* 65 M.J. 178, 181 (C.A.A.F.2007) (citations omitted). "Whether there has been improper reference to an accused's invocation of his constitutional rights is a question of law we review de novo." *Id.* (citing *United States v. Alameda,* 57 M.J. 190, 198 (C.A.A.F.2002)). However, because the appellant "failed to preserve [the] asserted error[ ] at trial, [he] forfeited [it] absent 'plain error.' " *Id.* (citing MIL. R. EVID. 103(a)(1), 103(d); *United States v. Bungert,* 62 M.J. 346, 347 (C.A.A.F.2006)). Under the *de novo* standard of review, plain error exists when: (1) there was an error; (2) it was plain, clear or obvious; and (3) the error resulted in material prejudice to an appellant's substantial rights. *United States v. Powell,* 49 M.J. 460, 463–65 (C.A.A.F. 1998). If constitutional plain error exists, that error must be harmless beyond a reasonable doubt. *United States v. Clark,* 69 M.J. 438, 448 (C.A.A.F.2011).

Shortly after LCpl James was killed on 30 March 1992, the appellant was arrested in his barracks room. Record at 1017–18. According to his testimony, Master Sergeant (MSgt)

Thomas Biller attempted to interrogate the appellant. On direct examination, Government counsel and MSgt Biller engaged in the following exchange:

Q: What was the purpose of that (transporting the appellant to the Naval Investigative Service office)?

A: In an attempt for a subsequent interview with them.

Q: Now you say you apprehended Walker. Do you recognize the accused here?

A: Yes, sir, I do.

Q: How is that?

A: I attempted to interview him that evening, sir.

Q: What was his demeanor during that time?

A: He was cocky at the time, sir.

*Id.* at 1018. During closing argument, Government counsel referenced MSgt Biller's testimony. Describing his entrance to LCpl Davis' house the night of the LCpl James killing, Government counsel told the members:

And what did Parker do? He grinned. He just grinned. That same grin he probably had when he was describing the way he killed Lance Corporal Page. That same cocky grin he had when Master Sergeant Biller arrested him.

*Id.* at 1390. This description of the appellant's demeanor was the only reference to MSgt Biller's testimony.

 Testimony or other evidence describing an accused's demeanor may be admissible to show identity or consciousness of guilt. *See e.g. Pennsylvania v. Muniz,* 496 U.S. 582, 591–92, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990); *Moran,* 65 M.J. at 188; MIL. R. EVID. 404(b). However, demeanor evidence may also be testimonial, which "implicates an accused's right to silence and against self-incrimination, thus triggering the application of the Fifth Amendment. . . ." *Clark,* 69 M.J.

---

**18.** Charge III, Specification 3; Charge I, Specification 2; Charge II, Specification 2; Charge V, Specification 2.

**19.** AOE VI. THE MILITARY JUDGE COMMITTED PLAIN ERROR IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION, ARTICLES 31 AND 55,

UCMJ, AND MIL. R. EVID. 301(F)(3), BY ALLOWING MASTER SERGEANT BILLER TO TESTIFY THAT HE ATTEMPTED TO INTERVIEW APPELLANT, BUT THAT APPELLANT ACTED "COCKY," IMPLYING THAT APPELLANT EXERCISED HIS RIGHT TO REMAIN SILENT.

at 444 (citation omitted). Additionally, "improper commentary on the accused's silence in response to police questioning when presenting evidence of an accused's demeanor may nevertheless implicate the same rights and protections as testimonial evidence." *Id.* at 445. Consequently, Government counsel's commentary on the appellant's demeanor is not dispositive, but must be analyzed in terms of the testimonial nature of the appellant's demeanor. *Id.*

 The appellant's "cocky" demeanor cannot be considered testimonial. He did not shake his head "yes" or "no", did not point to himself or otherwise imply that he had done something. In other words, he was not communicating a factual assertion. *See Muniz,* 496 U.S. at 594, 110 S.Ct. 2638. His demeanor might best be described as attitude, bearing or manner, which is inherently subjective and, particularly in this case, non-testimonial.

Government counsel picked up on this attitude, using it to paint the appellant in an unsympathetic light. His description of the appellant arriving at LCpl Davis' house with a "cocky grin" was meant to imply that the appellant took pleasure in killing. Record at 1390. The appellant argues, essentially, that by using the word "cocky," Government counsel was implying that the appellant was asserting his right to silence and, by asserting that right, he was guilty. Appellant's Brief at 76. This is an inferential leap that we find tenuous at best given Government counsel's actual words.

Consequently, we find that the appellant's "cocky" attitude was not demeanor evidence of a testimonial nature and that MSgt Biller's description of the appellant as "cocky" and Government counsel's use of this description in closing argument was not an improper commentary on this evidence. As such, the appellant's rights to silence and against self-incrimination were not implicated and the protections of the *Fifth Amendment were not* triggered. Finally, we find that Government counsel's use of the word "cocky" was per-

missible under MIL. R. EVID. 403 and 404(b). Although the record is devoid of any consideration of a MIL. R. EVID. 403 balancing test, we independently apply the test and find that the material, to wit: the "cocky" grin, is not substantially more prejudicial than probative as its limited use in this litigation constituted fair comment upon the disposition of the appellant both during the evening of 30 March 1992 and after being placed in military apprehension.

C. *Improperly admitted testimony describing LCpl Page's injury* [20]

 "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." MIL. R. EVID. 403. A military judge's ruling to admit or exclude evidence in light of a MIL. R. EVID. 403 objection is ordinarily reviewed for an abuse of discretion. *United States v. Freeman,* 65 M.J. 451, 453 (C.A.A.F.2008). This standard "recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *Id.* (quoting *United States v. Gore,* 60 M.J. 178, 187 (C.A.A.F.2004)).

The appellant objects to the admission of Onslow County Deputy Sheriff Paul Starzynski's description of LCpl Page's injuries. Over defense objection, the trial judge allowed the deputy sheriff to define the "evisceration" of the victim's organs as follows:

An evisceration is a protrusion of vital internal organs through the upper epidermal through your skin. It's when your internal organs come out through the skin.

Record at 529. We find that the trial judge did not abuse his discretion by overruling the defense counsel's objection. This evidence was probative in that it established LCpl Page's injury as well as corroborated the testimony that the appellant shot LCpl Page at close range and later commented to LCpl Brown that the police would need a separate chalk outline of LCpl Page's heart because the appellant blew it out of his chest. Rec-

---

**20.** AOE CVII. THE MILITARY JUDGE ERRED TO APPELLANT'S SUBSTANTIAL PREJUDICE BY ALLOWING OFFICER PAUL STARZYNSKI OF THE ONSLOW COUNTY SHERIFF'S DE-PARTMENT, OVER DEFENSE OBJECTION, TO DESCRIBE THE INJURY TO [LCPL] PAGE. (Citations omitted).

ord at 684; PE 13. There was minimal prejudicial effect from this description, considering the descriptions of LCpl Page's injury already in evidence—many of them statements made by the appellant and testified to by his co-conspirators at trial. As such, the danger of unfair prejudice did not substantially outweigh the probative value of this evidence and the trial judge did not abuse his discretion in overruling defense counsel's objection and admitting Deputy Sheriff Starzynski's testimony.

## V. Instructional Error

### A. *Definition of premeditation* [21]

The appellant contends that his case in chief was devastated by the trial judge's failure to instruct the members that: "... the government must prove to you beyond a reasonable doubt that the killing was committed by the accused 'after reflection by a cool mind.'" AE CCX at 3 and 5.

The trial judge declined to give the "cool mind" instruction stating in part:

> It seems to me that cool mind may be an appropriate discussion by commentators of the law, but it's not very useful as an instruction without a definition because to the average man, cool mind seems to me to mean without emotion; and if so, that's certainly not the law.

Record at 1370. In the end, the trial judge gave the following instruction to the members:

> A murder is not premeditated unless the thought of taking life was consciously conceived, and the act or omission by which it was taken was intended. The term "premeditated design to kill" means the formation of a specific intent to kill and consideration of the act intended to bring about death.

*Id.* at 1425. This instruction varies, in part, from that which the trial judge had given to the members earlier in the trial, while the defense expert Dr. Whitlock was testifying. The instruction given during the expert's testimony was as follows:

> "Premeditated design to kill means the formation of a specific intent to kill and consideration of the act intended to bring about death." I'll read you the next sentence. "The premeditated design to kill does not have to exist for any measurable or particular length of time. The only requirement is that it must precede the killing.

*Id.* at 1271. The occasion of the trial judge reading this instruction to the members during the presentation of the defense expert was highlighted by an exchange between the trial judge and the expert witness. The trial judge, paraphrasing from written questions submitted by the members, stated:

> Q: The first question, Dr. Whitlock, is: It seems that you are saying that rational thought, as you see it, is impaired with alcohol?
>
> A: Yes.
>
> Q: That would be any amount of alcohol?
>
> A: Yes, sir.
>
> Q: It seems, in your opinion, that one's ability to premeditate is based on no impairment of judgment or rational thought?
>
> A: That's correct.
>
> Q: And then the third question was: How do you define premeditate? Let me just first tell you the legal definition, which is probably not too helpful; but it is what—it's the definition that I will give all the members. "Premeditated design to kill means the formation of a specific intent to kill and consideration of the act intended to bring about death." Does that meet with your understanding of premeditation?
>
> A: There is also the definition that I read, "in a cool frame of mind—or a rational frame of mind," is the way I interpreted it.
>
> Q: I'm not including that in the definition, but it might be one that you could argue either way. As I defined it, would that be sufficient to—
>
> A: Would you please read it again?

21. AOE X. THE MILITARY JUDGE ABUSED HIS DISCRETION BY REFUSING TO GIVE A DEFENSE REQUESTED INSTRUCTION ON PREMEDITATION WHICH DEFINED PREMEDITATION IN TERMS OF REFLECTION WITH A COOL MIND.

Q: "Premeditated design to kill means the formation of a specific intent to kill and consideration of the act intended to bring about death."

A: If that's your definition—that's the definition of premeditation; is that correct?

Q: I don't know of any requirement that someone coolly reflect upon it before they do it.

A: Okay. Then that's a different definition than I read; so, if—what is the question? I'm sorry—if that's the definition?

Q: All right. So, would that definition that I just read you, would that change your opinion as to whether or not Lance Corporal Parker had the ability to premeditate on the night in question?

A: Let me think about it because someone else mentioned the fact that could he have a goal—a directed goal and carry through with it, and I said, "Yes." I agreed with that, and it sounds like this definition of premeditation kind of fits that pattern of a goal and being able to carry through with it. Is that ——

Q: I probably can't help you any more than I already have.

A: Would you read the definition again, please?

Q: "Premeditated design to kill means the formation of specific intent to kill and consideration of the act intended to bring about death." I'll read you the next sentence. "The premeditated design to kill does not have to exist for any measurable or particular length of time. The only requirement is that it must precede the killing."

A: Then it was premeditated, according to that definition.

*Id.* at 1270–71.

Of note, amidst this rather unusual process, the trial judge failed to give the members the additional aspect of the instruction which he had shared with counsel during the Article 39a session: that "the accused must have reflected or deliberated prior to the killing." Record at 1273.

Thereafter, the defense requested another Article 39a session, and again requested that their special jury instruction on "cool mind" be delivered to the members. The court did not address this request for reconsideration directly, but rather simply determined to re-read the bench book instruction to the members. Dr. Whitlock was then subjected to re-direct and re-cross-examination which included this colloquy with both counsel:

Q: (from defense counsel) Dr. Whitlock, I know you're not a lawyer, sir; and I know that this legal jargon can be complex; but one of the elements, or requirements, that the military judge just read to you for premeditated murder is "consideration"; consideration of the act intended. Could Lance Corporal Parker, or anyone suffering from a blood alcohol content of 400 milligrams per deciliter, consider the act that they intended?

A: Not in a rational mind.

Q: Okay. And that's, again, because—

A: Because of the level of intoxication.

. . . . .

Q: (by the trial counsel for re-cross examination) So, now it's not premeditated, sir?

A: No.

Q: Doctor, you testified that Lance Corporal Parker could fix on a goal and pursue it for hours?

A: Yes, sir.

Q: But he can't consider what he's doing?

A: Not in a rational mind.

Q: What's your definition of a "rational mind," sir?

A: Someone who is not intoxicated could be rational, but someone that is intoxicated is not rational.

*Id.* at 1277–78.

We include these references to place overall context upon the trial judge's unusual intervention with the members amidst the presentation of the defense expert's testimony. Having set forth the relevant portions of the record, we now turn to our analysis.

■ It is an essential premise of military jurisprudence that it is an abuse of discretion for a trial judge to refuse to grant a defense request for an instruction to the members so

long as that instruction: (1) Is correct; (2) Is not encompassed within the judge's instructions and, of greatest significance, (3) Relates to " 'such a vital point in the case that failure to give it deprived (the accused) of a defense or seriously impaired its effective presentation.' " *United States v. Carruthers*, 64 M.J. 340, 345 (C.A.A.F.2007) (quoting *United States v. Gibson*, 58 M.J. 1, 7 (C.A.A.F. 2003)). As the LCpl James murder and attendant convictions are no longer before us, we review this instructional issue with only the murder of LCpl Page in view and with most copious attention focused upon the defense to that charge of capital, premeditated murder, namely that the appellant could not form the requisite premeditative intent due to his significant level of intoxication.

 The CAAF and this court have long recognized the relevance of the "cool mind" concept in cases dealing with premeditated murder. In *United States v. Viola*, the Army Court of Military Review wrote that "[i]ntent to kill alone is insufficient to sustain a conviction for premeditated murder. To sustain such a conviction, the killing must have been committed after reflection by a cool mind." 26 M.J. 822, 829 (A.C.M.R.1988) (internal citations omitted), *aff'd*, 27 M.J. 456 (C.M.A.1988). The CAAF acknowledged this concept when they articulated that "[w]e are simply unable to conclude, on this record, that there is sufficient evidence that appellant, with a cool mind, reflected on the consequences of his actions before firing the first shot." *United States v. Hoskins*, 36 M.J. 343, 347 (C.M.A.1993). More recently, this court confirmed the "cool mind" concept as legitimate, but clarified that the use of the term is not what is required but rather, that the instruction cover "the important concept of the distinction between premeditated murder and unpremeditated murder." *United States v. Levell*, 43 M.J. 847, 852 (N.M.Ct. Crim.App.1996), *aff'd*, 46 M.J. 160 (C.A.A.F. 1996) (summary disposition). We review this record with the guidance given us by our predecessors in *Levell*, in which the appellant argued that a conviction for premeditated murder could not be sustained if the accused were in a state of rage because such a state would preclude the capacity to form a "premeditated design to kill." *Id.* at 852. Here,

rather than rage, we are confronted with an alleged state of intoxication: by any reading of the facts before us, the appellant consumed a substantial amount of alcohol prior to the LCpl Page murder. Like our court in *Levell*, we again embrace the "cool mind" concept as a legitimate aspect of military jurisprudence. Moreover, we conclude that the literal use of the term "cool mind" is not required to be delivered by the trial judge to the members within his instructions. Rather, the trial judge must make clear the distinction between premeditated murder and unpremeditated murder and must clearly convey to the members the requirement that the appellant set forth, through his words and actions, the "premeditated design to kill". *Id.* at 852.

 We begin this analysis with a review of the trial judge's charge to the members on both premeditated and unpremeditated murder. As stated above, while not including the term "cool mind" within his instruction on premeditated murder, the trial judge did include, as required, the concept of a "premeditated design to kill." The judge defined premeditated design to kill as meaning "the formation of a specific intent to kill and consideration of the act intended to bring about death." Record at 1425. The instruction also set forth that "a murder is not premeditated unless the thought of taking life was consciously conceived, and the act or omission by which it was taken was intended." *Id.* As noted by the appellant in his brief, the trial judge failed to repeat that section of his instruction, discussed with counsel, which would have directed the members that "the accused must have reflected or deliberated prior to the killing." Nevertheless, the trial judge ultimately manifested language that equates to this reference and comports with the requirements of law. *See Levell*, 43 M.J. at 851.

The trial judge also satisfied our *Levell* mandate by clearly delineating the differences between premeditated and unpremeditated murder. As to unpremeditated murder, the trial judge was most careful in tailoring his instruction on the lesser included offense within the context

of the primary defense to the LCpl Page murder—the alleged intoxicated state of the appellant. The instruction states:

As explained below, voluntary intoxication or partial mental responsibility, either alone or together with other evidence, may cause you to have reasonable doubt that the accused entertained the premeditated design to kill, which is a required element of premeditated murder. If you have such doubt regarding premeditated murder and find him not guilty of that offense, you must next turn to the lesser included offense of unpremeditated murder.

Record at 1425.

We conclude that the trial judge's instruction on premeditated murder implicitly included the overall concept of "cool mind" by properly emphasizing the key requirement that the appellant had to form a "premeditated design to kill". *Levell*, 43 M.J. at 850. We also note that the instructions gave particular emphasis on the vast gulf between premeditated and unpremeditated murder and properly articulated the defense theory that encouraged the members to find the Government's case insufficient as to the ability to formulate a "premeditated design to kill"—or in other words, being able to establish and carry out this design with a "cool mind" as would be required to convict the appellant of premeditated murder.

Assuming without deciding that failing to give the requested instruction as to "cool mind" were to be deemed error, we conclude that the nearly unparalleled volume of evidence substantiating premeditation with a "cool mind"—even assuming some level of alcohol impairment—would enable us to deem such error harmless beyond any reasonable doubt, and we would further be able to conclude that the members would have reached the same verdict absent the error. *Neder v. United States*, 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). As we

noted in our discussion of the spillover issue, *supra*, the evidence of the appellant's guilt in the LCpl Page killing is truly overwhelming—even to the point of depriving him of a safe harbor in the form of a defective judicial instruction to the members.

B. *The rejected voluntary intoxication instruction* [22]

■ The appellant contends that the trial judge erred in failing to grant his motion to instruct the members that voluntary intoxication could be considered by the members so as to reduce premeditated murder to unpremeditated murder or, most notably, manslaughter. The appellant based his motion upon a learned treatise and the concurring and dissenting opinions of two cases from the Court of Military Appeals.[23] Essentially, the appellant asserted at trial and again contends on appeal that the present state of military jurisprudence relative to the intent element within unpremeditated murder is fundamentally unsound.

We disagree with the appellant and note that the trial judge properly instructed the members that unpremeditated murder is the lesser included offense of premeditated murder. The then Court of Military Appeals (CMA) settled with finality the outstanding question as to whether evidence of voluntary intoxication "should ever be considered on the question of one's capacity to form the intent to kill or inflict great bodily harm." *United States v. Morgan*, 37 M.J. 407, 412 (C.M.A.1993) (citation omitted). The CMA concluded that:

After careful consideration, we see no reason to overrule the long-standing decisions of this Court which have consistently held that *voluntary* intoxication will not in military law negate that criminal intent necessary for the commission of unpremeditated murder.

*Id.*

In short, the trial judge did not err when he declined to adopt the appellant's proposed

22. AOE XI. THE MILITARY JUDGE ERRED BY DENYING THE DEFENSE MOTION FOR AN INSTRUCTION THAT VOLUNTARY INTOXICATION CAN REDUCE PREMEDITATED MURDER TO VOLUNTARY MANSLAUGHTER, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH AND EIGHTH AMEND-

MENTS TO THE U.S. CONSTITUTION, ARTICLE 55, UCMJ, AND R.C.M. 801(A)(5).

23. Milhizer, *Voluntary Intoxication as a Criminal Defense Under Military Law*, 127 Mɪʟ. L.Rᴇᴠ. 131 (1990).

member's instruction articulating manslaughter as a lesser included offense of premeditated murder if they were to conclude that the appellant killed LCpl Page whilst voluntarily intoxicated.

C. *The tailored voluntary intoxication instruction* [24]

■ The appellant contends that the trial judge portrayed for the members an inaccurate account of his reaction upon learning from a deputy sheriff that LCpl Page was dead. The appellant further contends that this alleged factual misrepresentation by the trial judge to the members was highly prejudicial and requires our remedial action. We disagree. In his instruction to the members on voluntary intoxication, the trial judge instructed the members that they could consider, *inter alia*, the following facts:

20. [T]estimony provided by Lance Corporal Brown that, when their car was stopped and searched at the main gate of Camp Lejeune, the accused was silent when Lance Corporal Curry told the MP's that they had been in Wilmington in accordance with the group's agreed upon alibi, and when the sheriff deputy said that a man had been shot, the accused asked whether the victim was dead;

21. [T]estimony provided by Lance Corporal Brown that, when the group returned to the barracks room, the accused again described the details of the murder, he laughed about the way the sheriff's deputy looked when the accused asked if the victim was dead, and the accused told Lance Corporal Brown about how he killed the victim[.]

Record at 1444.

At trial, defense counsel did not object to the instruction as factually inaccurate. Instead, he contended that the comments relating to the appellant's laughter were "extremely inflammatory". Record at 1373–74. On appeal, the Government argues that the

appellant waived any objection to the factual basis of the trial judge's factual summation to the members by not being specific enough in articulating their objection below. Government Brief of 17 Jan 2012 at 125. We do not believe that the trial defense counsel's objection to instructions was so anemic as to constitute waiver. *Simpson*, 56 M.J. at 462.

The trial judge based this particular portion of his instructions on the testimony of LCpl Brown. Record at 682–83. Based upon our review of that testimony, it is clear to us that, while accurate in the main, the trial judge's instructions were erroneous in that there was no testimony that the appellant laughed when discussing how the deputy sheriff indicated that LCpl Page was dead. However, the instruction was accurate in every other respect and did not draw an objection as to factual basis by the defense. If we are to assume without deciding that this factual error constituted plain and obvious error, for such an error to be deemed harmless beyond a reasonable doubt, the Government must prove that the members would have reached the same verdict absent the error. *Neder*, 527 U.S. at 19, 119 S.Ct. 1827. Once again, under the specific facts surrounding the murder of LCpl Page, we are convinced beyond any doubt that the members would have so decided. In short, the minor factual inaccuracy in this aspect of the trial judge's instructions pales in comparison to the tremendous weight of evidence wrought upon the appellant by his own words and conduct.

D. *The testimony of LCpl McDonald's prior NJP* [25]

Trial defense counsel attempted to impeach LCpl McDonald by questioning him about a prior nonjudicial punishment. Record at 622. When the trial judge sustained the Government's objection to this line of questioning, trial defense counsel moved on, making no offer of proof as to the admissibility of the underlying misconduct. *Id.; Unit-*

24. AOE XII. THE MILITARY JUDGE'S TAILORED INSTRUCTION ON VOLUNTARY INTOXICATION WAS FACTUALLY INACCURATE.

25. AOE CVIII. THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE INSTRUCTED THE MEMBERS TO DISREGARD TESTIMONY BY LCPL MCDONALD, ELICITED BY THE DEFENSE AS IMPEACHMENT ON CROSS-EXAMINATION, THAT HE HAD RECEIVED NONJUDICIAL PUNISHMENT FOR WRITING BAD CHECKS. (Citations omitted).

*ed States v. Casey*, 45 M.J. 623, 628 (N.M.Ct. Crim.App.1996). This failure to make an offer of proof constituted waiver. *Id.* Additionally, considering the substantial weight of the evidence supporting the appellant's guilt for the LCpl Page murder, we find that any error was harmless beyond a reasonable doubt.

## E. *Voting on findings* [26]

The plain language of R.C.M. 921(c)(5) requires court-martial members to vote on the greater charged offense before voting on lesser included offenses. The trial judge properly instructed on this requirement, taking care to also instruct the members that they should freely discuss the evidence. Record at 1457. As such, we decline to find error. *See United States v. Curtis*, 44 M.J. 106, 152–53 (C.A.A.F.1996).

## F. *Multiple theories of liability* [27]

The trial judge did not commit plain error by instructing the members on multiple theories of liability for several of the specifications. Record at 1429–30. Reading the elements of a charge and then instructing on alternate theories such as aider and abettor or conspiracy is an accepted method of instructing the members. *Schad v. Arizona*, 501 U.S. 624, 631, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion); *United States v. Vidal*, 23 M.J. 319, 325 (C.M.A. 1987). We decline to find instructional error on these grounds.

---

**26.** AOE CXIV. THE MILITARY JUDGE ERRED BY DENYING THE DEFENSE MOTION TO INSTRUCT THE MEMBERS TO VOTE ON THE LESSER INCLUDED OFFENSES FIRST. (Citations omitted).

**27.** AOE CXV. THE MILITARY JUDGE COMMITTED PLAIN ERROR BY INSTRUCTING THE MEMBERS THAT THEY COULD RENDER A GENERAL VERDICT OF GUILTY ON VARIOUS SPECIFICATIONS AFTER BEING INSTRUCTED ON MULTIPLE THEORIES OF LIABILITY. (Citations omitted).

**28.** AOE LXVII. DISCUSSION OF FINDINGS AND SENTENCING INSTRUCTIONS AT R.C.M. 802 CONFERENCES DENIED APPELLANT HIS RIGHT TO BE PRESENT AT "EVERY STAGE OF THE TRIAL." (Citations omitted).

**29.** AOE XIII. BOTH ARTICLE 134 KIDNAPPING SPECIFICATIONS UNDER CHARGE V

## G. *R.C.M. 802 conferences* [28]

Discussion of findings and sentencing instructions at an R.C.M. 802 conference outside the presence of the accused is an appropriate method of facilitating the drafting of instructions. Per R.C.M. 802, an accused is not prohibited from attending R.C.M. 802 conferences and both Government and defense counsel are free to object to any matter on the record notwithstanding R.C.M. 802. In this case, the trial judge summarized the specific R.C.M. 802 conference on the record and the parties made their objections on the record. Record at 1373–75. This procedure was wholly appropriate and did not violate R.C.M. 804(a) or any other substantial right of the appellant.

## VI. Article 134, UCMJ[29]

Whether a specification is defective is a question of law we review *de novo*. *United States v. Ballan*, 71 M.J. 28, 33 (C.A.A.F.2012) (citing *United States v. Crafter*, 64 M.J. 209, 211 (C.A.A.F.2006)). "A specification is sufficient if it alleges every element of the charged offense expressly or by necessary implication." R.C.M. 307(c)(3). This requirement ensures an accused is given notice and protection against double jeopardy. *United States v. Dear*, 40 M.J. 196, 197 (C.M.A.1994). Consequently, charges and specifications based on Article 134, UCMJ, including kidnapping, must include the terminal element either expressly or by necessary implication.[30] *United States v. Fosler*, 70 M.J. 225, 230–32 (C.A.A.F.2011). The appel-

---

FAIL TO STATE AN OFFENSE BECAUSE THEY DO NOT ALLEGE, EXPRESSLY OR BY NECESSARY IMPLICATION, THE TERMINAL ELEMENT.

**30.** Under Article 134, UCMJ, kidnapping consists of the following elements: (1) That the accused seized, confined, inveigled, decoyed, or carried away a certain person; (2) That the accused then held such person against that person's will; (3) That the accused did so willfully and wrongfully; and (4) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. MCM, Part IV, ¶ 92b. The fourth element is traditionally deemed the terminal element.

lant argues that his convictions for kidnapping LCpl Page and LCpl James should be set aside because the specifications that form the basis for those convictions do not include, either expressly or by necessary implication, the terminal element.[31] Appellant's Brief at 121. We agree.

It is clear that the doctrine of implied elements is no longer viable, nor is the related theory that the terminal elements are, *per se*, included in every enumerated offense. *United States v. Miller*, 67 M.J. 385, 389 (C.A.A.F.2009) (citing *United States v. Sapp*, 53 M.J. 90, 92 n. 2 (C.A.A.F.2000)). However, convictions under Article 134, UCMJ, that are based upon specifications that do not allege the terminal element have been subjected to varying degrees of scrutiny. In *Fosler*, the CAAF explained that "in contested cases, when the charge and specification are first challenged at trial, we read the wording more narrowly and will only adopt interpretations that hew closely to the plain text." *Fosler*, 70 M.J. at 230 (citing *United States v. Watkins*, 21 M.J. 208, 209–10 (C.M.A.1986)) (footnote omitted). In *Ballan*, the CAAF ruled that charges and specifications to which an appellant pled guilty and did not object at trial were also required to include the terminal element, although they are viewed with "maximum liberality." *Ballan*, 71 M.J. at 33, 35 n. 8. Finally, in *United States v. Humphries*, the CAAF found prejudice in a case in which the appellant contested an Article 134, UCMJ, charge of adultery, but did not object to the specification at trial. 71 M.J. 209 (C.A.A.F.2012).

Prior to the release of *Ballan* and *Humphries*, we upheld the kidnapping conviction of the appellant's co-conspirator, LCpl Wade L. Walker. *United States v. Walker*, 71 M.J. 523, 532 (N.M.Ct.Crim.App.2012). Viewing the Article 134, UCMJ, specification liberally, we held that the specification suffi-

ciently implied the terminal element and was not "so defective that it cannot be reasonably construed to charge a crime." *Id.; see also United States v. Hackler*, 70 M.J. 624, 626 (N.M.Ct.Crim.App.2011) ("[W]e view allegations of defective specifications through different analytical lenses based on the circumstances of each case. Where the specification was not challenged at trial, we liberally review the specification to determine if a reasonable construction exists that alleges all elements either explicitly or by necessary implication."), *rev. denied*, 71 M.J. 305 (C.A.A.F.2012). However, in light of *Ballan* and *Humphries*, we cannot "necessarily imply a separate and distinct element from nothing beyond allegations of the act or failure to act itself." *Ballan*, 71 M.J. at 33 (internal quotation marks omitted).

Given the framework established in *Fosler*, *Ballan* and *Humphries*, a certain amount of judicial opaqueness still exists as to the limits of the necessarily implied theory. In *Walker*, we found that LCpl James' status as a Marine, which was reflected in the actual wording of the specification, necessarily implied the terminal elements. *Walker*, 71 M.J. at 532. To a certain extent, it is logical that discredit to the Marine Corps and prejudice to unit order and discipline is necessarily implied when one Marine kidnaps another. However, the *consequences* of acts alleged in a specification do not necessarily *imply* additional elements. Indeed:

> [A] violation of any of the three clauses of Article 134, UCMJ, "does not necessarily lead to a violation of the other clauses" . . . and the principle of fair notice requires that an accused know to which clause he is pleading guilty and against which clause or clauses he must defend.

*Ballan*, 71 M.J. at 34 (citing *Fosler*, 70 M.J. at 230; *United States v. Medina*, 66 M.J. 21,

---

**31.** Specification 1 of Charge V reads:
In that Lance Corporal Kenneth G. Parker, U.S. Marine Corps, Headquarters Company, 2d Marines, 2d Marine Division, Fleet Marine Force, on active duty, did, at Jacksonville, North Carolina, on or about 26 March 1992, willfully and wrongfully seize, carry away, and hold Lance Corporal Rodney L. Page, U.S. Marine Corps, against his will.
Specification 2 of Charge V reads:

In that Lance Corporal Kenneth G. Parker, U.S. Marine Corps, Headquarters Company, 2d Marines, 2d Marine Division, Fleet Marine Force, on active duty, did, at Camp Lejeune, North Carolina, on or about 30 March 1992, willfully and wrongfully inveigle, decoy, seize, carry away, and hold Lance Corporal Christopher Q. James, U.S. Marine Corps, against his will.

26 (C.A.A.F.2008)). Although we view the terminal elements as logical consequences of the facts alleged in the appellant's kidnapping specifications, we adhere to *Fosler, Ballan* and *Humphries* and find that those specifications did not necessarily imply the terminal elements.

Ultimately, "a charge that is defective because it fails to allege an element of an offense, if not raised at trial, is tested for plain error." *Ballan,* 71 M.J. at 34 (citations and footnote omitted). This is true whether the appellant contested their conviction or plead guilty. *Id.* at 35 n. 8. Under the plain error analysis, the appellant has the burden of showing: (1) there was error; (2) the error was plain or obvious; (3) the error materially prejudiced a substantial right of the accused. *United States v. Girouard,* 70 M.J. 5, 11 (C.A.A.F.2011). In this case, we find that there was error, it was plain or obvious, and that the error materially prejudiced the substantial rights of the appellant.

Under the third prong of the plain error analysis, the question is "whether the defective specification resulted in material prejudice to Appellee's substantial right to notice." *Humphries,* 71 M.J. at 215 (citation omitted). Although the appellant has the burden of showing prejudice under a plain error analysis, this burden may be met if "[n]either the specification nor the record provides notice of which terminal element or theory of criminality the Government pursued." *Id.* at 216, 217 n. 10 (citing *Girouard,* 70 M.J. at 11). Having reviewed the entire record, we are convinced that the appellant's substantial rights were materially prejudiced by the complete lack of reference to the terminal elements until after the close of evidence. The Government did not mention the terminal elements in their opening statement, and elicited little to no testimony that discussed how the appellant's behavior violated either

clause 1 or 2 of Article 134, UCMJ.[32] Although the trial judge properly instructed the members on the elements of kidnapping, including the terminal elements of Article 134, UCMJ, this did not constitute adequate notice as it "did not alert [the appellant] to the Government's theory of guilt" until after the close of the evidence. *Id.* at 216. Having found prejudice, in our decretal paragraph we will set aside the findings of guilty for the affected charge and specifications and dismiss Charge V and its two specifications for failure to state an offense.

## VII. Court–Martial Composition and Venue

### A. Voir Dire [33]

We review a trial judge's decision to limit individual or group *voir dire* for a "clear abuse of discretion." *United States v. Jefferson,* 44 M.J. 312, 317 (C.A.A.F.1996) (citing *United States v. Parker,* 19 C.M.R. 400, 406, 1955 WL 3458 (C.M.A.1955)). As it is within the trial judge's discretion to set the limits and procedures for *voir dire,* it is up to each trial judge to decide whether *voir dire* is done by the trial judge personally or by counsel. *Jefferson,* 44 M.J. at 318–19; R.C.M. 912(d). Fundamentally, *"[v]oir dire* examination serves to protect [the right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors." *United States v. Richardson,* 61 M.J. 113, 118 (C.A.A.F.2005) (quoting *Mc-Donough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984)) (alteration in original).

The appellant asserts that the trial judge's thirty-minute time limit on individual *voir dire* violated the appellant's constitutional rights. Appellant's Brief at 143. He argues that this time limitation prevented counsel from asking potential members questions regarding fairness and impartiality, the ability

---

**32.** We note that this lack of evidence pertaining to the terminal element is not surprising and, in fact, understandable, as all parties in this case were wholly focused on the LCpl Page and LCpl James murders, as well as the capital nature of the case.

**33.** AOE XVII. THE MILITARY JUDGE VIOLATED APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE CONSTITUTION WHEN HE IMPERMISSIBLY CURTAILED APPELLANT'S RIGHT TO *VOIR DIRE* MEMBERS CONCERNING THEIR VIEWS REGARDING BIAS OR PREJUDICE TOWARD RACIAL ISSUES, TRYING TWO MURDER CHARGES IN THE SAME COURT–MARTIAL, AND THEIR ABILITY TO CONSIDER MITIGATING EVIDENCE.

to follow the trial judge's instructions, race and bias, and the death penalty. *Id.* at 177. We disagree.

There is little evidence in the record that the trial judge prevented the appellant's counsel from questioning the members on subjects such as impartiality, race and the death penalty. The trial judge's time limit did not dictate which questions counsel were able to ask. In fact, counsel asked questions regarding voluntary intoxication and mental responsibility, mitigation evidence, spillover, and the death penalty. Record at 279, 283, 284, 287. Although questions regarding race were limited to the first two potential members, the breadth of questioning by the defense tends to show that the trial judge's time limitations had little to no effect on counsel's choice of questions. For whatever reason, the defense chose not to question all the members regarding race. Absent a specific request by the defense, the trial judge is not obliged to question the members on potential racial bias. *Turner v. Murray*, 476 U.S. 28, 37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986).

The appellant's counsel exercised his own discretion when questioning the potential members during *voir dire.* The thirty-minute time limit set by the trial judge did not prevent, chill or otherwise limit the potential subject areas available to counsel. As such, the trial judge did not abuse his discretion and we decline to set aside the sentence or the verdict on these grounds.

B. *Change of venue* [34]

 We review the trial judge's decision to deny a motion to change venue for an abuse of discretion. *United States v. Loving,* 41 M.J. 213, 282 (C.A.A.F.1994). Due process requires all courts-martial to be composed of members who are fair, impartial and "whose evaluation is based solely upon the evidence, and not upon prejudgment that may occur as a result of pretrial publicity." *United States v. Simpson,* 58 M.J. 368, 372 (C.A.A.F.2003) (citing *Curtis,* 44 M.J. at 139).

Although adverse pretrial publicity does not necessarily result in an unfair trial, pretrial publicity may be unfair if the appellant can establish that there was either presumed prejudice or actual prejudice. *Neb. Press Ass'n v. Stuart,* 427 U.S. 539, 554–55, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Simpson,* 58 M.J. at 372. Presumed prejudice requires pretrial publicity that: (1) Is prejudicial, (2) Is inflammatory, and (3) Has saturated the community. *Id.* (citing *Curtis,* 44 M.J. at 139). Actual prejudice exists when "members of the court-martial panel had such fixed opinions that they could not judge impartially the guilt of the accused." *Id.* (citing *Curtis,* 44 M.J. at 139). Mere knowledge of the facts of the case on the part of the members is insufficient to establish prejudice, even if those facts are highly incriminating. *Id.*

 The seminal cases addressing negative pretrial publicity follow a distinct fact pattern: A heinous crime perpetuated in a small town in which a large majority of the potential jury pool was pervasively and irrevocably contaminated with extremely damning evidence. For example, in *Rideau v. Louisiana,* the sheriff broadcast a suspect's confession on local television three times, with estimated viewership of over 100,000 people in a town of 150,000. 373 U.S. 723, 724, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). The Supreme Court held that:

> [I]t was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged.

*Id.* at 726, 83 S.Ct. 1417. Similarly, in *Irvin v. Dowd,* a veritable monsoon of media attention accompanied the arrest and trial of a man accused of six murders in Evansville, Indiana. 366 U.S. 717, 725–28, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Leading up to the trial, newsprint and television media, which the Supreme Court estimated reached nearly

---

**34.** AOE XX. THE MILITARY JUDGE ABUSED HIS DISCRETION IN DENYING APPELLANT'S MOTION FOR A CHANGE IN THE PLACE OF TRIAL BECAUSE OF ADVERSE PRETRIAL PUBLICITY, IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION, ARTICLE 55, UCMJ, AND R.C.M. 906(B)(11).

100 percent of households in the area, consistently portrayed the accused as guilty. These news outlets reported extensively on his criminal history, identification at the various crime scenes, offer to plead guilty in return for a life sentence, and eventual confession. *Id.* Notably, the trial court excused 268 of 430 potential jurors, nearly two-thirds, because they had a fixed notion of the accused's guilt. *Id.* at 727, 81 S.Ct. 1639. While these cases predate the development of presumed prejudice as an enunciated legal theory, they provide substantive guidance regarding the extraordinary level of negative publicity required to prejudice an accused. *See also Rock v. Zimmerman,* 959 F.2d 1237, 1252–53 (3d Cir.1992) (prejudice from pretrial publicity found only in those cases in which media and community reaction was so hostile that the trial atmosphere was unquestionably compromised).

In this case, we do not find that the pretrial publicity rose to the level found in *Rideau* or *Dowd.* Although media reports contained statements that the appellant considers prejudicial and inflammatory, we do not consider them to be unduly "sensationalistic." *See United States v. Gray,* 51 M.J. 1, 28 (C.A.A.F.1999). Nearly all of those statements were drawn from the trials of the appellant's co-conspirators and were either recitations of fact or argument from Government counsel. Of the 100 or so articles included in the record, many mention the appellant sparingly, the main subject of the article being LCpl Walker or another co-conspirator. There was little evidence of the overwhelming television or radio exposure found in cases like *Rideau* and *Dowd.* In fact, upon Government request, one major television station, the local NBC affiliate, conducted a search of its archives and found no mention of the LCpl Page or LCpl James murders among its news reports. The appellant's argument regarding community saturation is also not based on statistical evidence, unlike the arguments from the appellants in *Rideau* and *Dowd.* Finally, although all the members in the appellant's trial had heard of the case,

their exposure to and recollection of the facts was minimal. A single member recalled reading about a note passed between the appellant and LCpl Walker while both were in the brig. Record at 433–34. However, this member did not remember the contents of the note, save that it said "we are going to be okay," or words to that effect. *Id.* at 434. For the above reasons, we do not find that pretrial publicity was so prejudicial, inflammatory, or widespread as to automatically taint the entire pool of potential members.

Considering the minimal impact any pretrial publicity had on the members, we also find that there was no actual prejudice among the members due to pretrial publicity. Reviewing the record, each and every member assured the court that any knowledge of the case would not impair their ability to be impartial and fair when evaluating the evidence. Record at 226, 273, 306, 336–39, 355–56, 372–73, 417, 433–34, 438–39. Moreover, each member's recollection was generally superficial and based on headlines or secondhand accounts. Finally, the appellant declined to challenge for cause any members from the final pool based on knowledge of the case. *Id.* at 459–64. Having found no presumed or actual prejudice among the members in this case, the trial judge did not abuse his discretion in denying the appellant's motion for a change in venue.

## C. *The trial judge* [35]

 Due to the trial judge's involvement in two related cases, the appellant argues that he abused his discretion when he denied the appellant's motion for recusal prior to trial. Under Article 41, UCMJ, a trial judge may be challenged at trial by the accused. Similarly, "a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." R.C.M. 902(a). "[I]f a reasonable person would not question the judge's impartiality on the basis of the facts presented, then it is not an abuse of discretion for the judge to deny the motion

**35.** AOE XXI. THE MILITARY JUDGE ABUSED HIS DISCRETION BY FAILING TO RECUSE HIMSELF, IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION, ARTICLES 55 AND 41(A)(1), UCMJ, AND R.C.M. 902(A).

for recusal." *Loving*, 41 M.J. at 253 (citation omitted).

Where the military judge makes full disclosure on the record and affirmatively disclaims any impact on him, where the defense has full opportunity to *voir dire* the military judge and to present evidence on the question, and where such record demonstrates that appellant obviously was not prejudiced by the military judge's not recusing himself, the concerns of RCM 902(a) are fully met.

*United States v. Campos*, 42 M.J. 253, 262 (C.A.A.F.1995) (citing *United States v. Mabe*, 33 M.J. 200 (C.M.A.1991)). A trial judge's exposure to a co-conspirator will not necessarily disqualify a trial judge. *United States v. Lewis*, 6 M.J. 43, 44–45 (C.M.A.1978).

The essence of the appellant's argument is that the trial judge's exposure to the general facts of the case, combined with the trial judge's finding that LCpl Brown was guilty of the LCpl Page murder as a co-conspirator with LCpl Parker, made it impossible for the trial judge to be impartial. We disagree. The trial judge was questioned during *voir dire* regarding his impartiality and his involvement in related cases was fully explored. Record at 168–71. The judge's answers to these questions did not reveal any inherent bias. Additionally, we are unable to discern a specific instance of partiality on the part of the trial judge connected to his participation in LCpl Brown's or LCpl Adams's trial. Finally, although he accepted LCpl Brown's guilty pleas as provident, he did not act as the trier of fact in the appellant's case and did not impart any opinion on the record regarding the credibility of LCpl Brown's testimony. *See United States v. Oakley*, 33 M.J. 27, 32–35 (C.M.A.1991) (trial judge's acceptance of co-conspirator's guilty plea did not require recusal). Based on the record,

the trial judge did not abuse his discretion when he denied the appellant's motion for recusal.

D. *Exclusion of certain enlisted members* [36]

The appellant's argument that Article 25(c)(1), UCMJ, discriminates based upon race finds little basis in the law. *See Gray*, 51 M.J. at 49–50. However, the appellant's argument is largely moot considering the appellant's own decision to elect trial by officer members only. Record at 144. The appellant made this decision despite the trial judge's instructions to the Government that enlisted members of the appellant's unit were eligible for selection as members of the appellant's court-martial, should the appellant elect a mixed court-martial panel. *Id.* at 84. This instruction was given after the appellant argued at the Article 39(a) hearing that Article 25(c)(1) was waivable. *Id.* As such, we decline to set aside the findings and sentence on these grounds.

## VIII. Post–Trial

A. *The staff judge advocate's recommendation* [37]

■ The appellant argues that the addendum to the staff judge advocate's recommendation (SJAR) was defective because it directed the convening authority to consider all of the matters submitted by the appellant's trial defense lawyers pursuant to R.C.M. 1105. This direction contravened the appellant's express indication to the command that he did not want the first clemency package considered. The appellant's reasoning for this unusual request was based on his discharge of his original trial defense counsel after the original clemency package was submitted but before the 27 October 1997 SJAR addendum.

---

36. AOE CI. EXCLUSION OF ENLISTED MEMBERS FROM THE ACCUSED'S UNIT FROM THE COURT–MARTIAL PANEL UNDER UCMJ, ARTICLE 25(C)(1), IS A RACIALLY DISCRIMINATORY RULE THAT PRECLUDES AFRICAN–AMERICAN ENLISTED MEN FROM HAVING THEIR PEERS SIT AS MEMBERS OF THE COURT MARTIAL. (Citations omitted).

37. AOE XXX. THE STAFF JUDGE ADVOCATE'S ADDENDUM RECOMMENDATION WAS DE-

FECTIVE BECAUSE IT DIRECTED THE CONVENING AUTHORITY TO CONSIDER MATTERS IN CLEMENCY AGAINST APPELLANT'S EXPRESS AND REPEATED REQUESTS THAT THE CONVENING AUTHORITY NOT CONSIDER THESE MATTERS, IN VIOLATION OF APPELLANT'S SUBSTANTIAL PERSONAL RIGHT TO SUBMIT CLEMENCY MATTERS UNDER RCM 1105, AND ARTICLE 60, UCMJ.

The convening authority must consider any matters submitted by the accused pursuant to Article 60(b), UCMJ. Article 60(c)(2), UCMJ; *see also* R.C.M. 1105, 1106(f), and 1107(b)(3)(A)(iii). The convening authority is vested with substantial discretion when he or she takes action on a court-martial sentence. Art. 60(c)(2)–(3), UCMJ. Before taking action, the convening authority must consider certain items listed in R.C.M. 1107 and may consider any other matter that the convening authority "deems appropriate." R.C.M. 1107(b)(3)(B)(iii).

In this case, the convening authority's consideration of the original petition for clemency was not error. The appellant's original clemency submission was submitted at a time when the appellant had not expressed any allegation of ineffective assistance of counsel. Therefore, his trial defense counsel did not take action for a client who was actively attacking his credibility, a situation that could be viewed as a conflict of interest. Moreover, this court's own review of the original submission does not reveal any blatant defects. Thus there is no presumptive taint associated with submission. Furthermore, even if the appellant is unhappy with the first submission, the convening authority is allowed in his discretion to consider matters adverse to the accused. R.C.M. 1107. R.C.M. 1107(b)(3)(B)(iii) expounds on this concept and requires actual notice and comment from the accused only "if the convening authority considers matters adverse to the accused from outside the record, with knowledge of which the accused is not chargeable...."

As demonstrated by the appellant's request for the convening authority not to consider the evidence, he had knowledge of the clemency submission. Per his discretion, the convening authority deemed it appropriate to review the submission and it was properly considered before he took action.

■ Even if we were to find error in the convening authority's consideration of the first clemency submission, the appellant would not be entitled to relief because he has failed to demonstrate "some colorable showing of prejudice." *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F.2000) (citation and internal quotation marks omitted).

The convening authority is the appellant's best hope for sentence relief. *United States v. Bono*, 26 M.J. 240, 243 (C.M.A.1988). Given the highly discretionary nature of the convening authority's clemency power, the threshold for showing post-trial prejudice is low. *United States v. Lee*, 52 M.J. 51, 53 (C.A.A.F.1999). Therefore, in analyzing post-trial errors the appellant gets the benefit of the doubt and needs to make only a "colorable showing of possible prejudice." *Id.* (citation and internal quotation marks omitted).

Applying these principles, we find that the appellant has failed to demonstrate a colorable showing of possible prejudice. Even if we assume error by the convening authority in considering the prior clemency submission, we fail to see how the consideration of the earlier submission affected relief in this case. The appellant makes a generic argument that it "is possible that the convening authority may have been more persuaded to grant clemency had he not been directed by his [staff judge advocate] to consider the matters the [staff judge advocate] submitted over the [a]ppellant's objection." Appellant's Brief at 290 (citations omitted). This allegation does not highlight any substantive difference between the two submissions which might lead to a conclusion that the convening authority might have acted differently if he had not considered the first clemency submission. Nor does this court's own review of the two submissions lead to that conclusion. The appellant's unsupported speculation is insufficient to make a colorable showing of possible prejudice. Accordingly, we find no merit to this claim.

B. *Consideration of matters submitted in clemency* [38]

■ The appellant claims that the convening authority did not give meaningful

38. AOE XXXI. THE CONVENING AUTHORITY'S ACTION IS DEFECTIVE BECAUSE THE CONVENING AUTHORITY WAS UNABLE TO FULFILL HIS STATUTORY DUTY TO GIVE MEANINGFUL CONSIDERATION TO MATTERS IN CLEMENCY BECAUSE OF HIS PER-

consideration to the matters submitted in clemency. The appellant argues that the convening authority's statements in a previous murder case reflected an inflexible attitude toward sentencing and thereby denied the appellant meaningful consideration of his clemency submission. Additionally, the appellant argues that the convening authority's refusal to meet personally with the substitute defense counsel to discuss clemency, despite substitute defense counsel's request, also demonstrates a lack of meaningful consideration.

As proof of the convening authority's inflexible attitude, the appellant references three affidavits submitted as enclosures to the 17 October 1997 clemency petition. The first two affidavits are from two defense counsel in an unrelated murder case. These attorneys were unable to secure a pretrial agreement from the same convening authority on a remand for resentencing, despite, in their opinion, having made "significant concessions concerning the sentence rehearing that should have warranted a pretrial agreement." Appellant's Clemency Submission, 2 Sep 1997, Encl. 1–2. The third affidavit is from the trial counsel in the previously mentioned case. Moving from Government to defense, he became the appellant's trial defense counsel. In his affidavit, he states that the staff judge advocate for the convening authority told him that the convening authority's "reluctance to agree to a pretrial agreement was to avoid the appearance that he had impeached the members' sentence. This was something that ... [he] said that he would not do." Appellant's Clemency Submission, 2 Sep 1997, Encl. 3.

Claims that a convening authority was disqualified from taking action on a court-martial sentence are reviewed *de novo*. *United States v. Davis*, 58 M.J. 100, 102 (C.A.A.F. 2003). We apply a rebuttable "presumption of regularity" to the convening authority's actions. *United States v. Wise*, 20 C.M.R. 188, 194, 1955 WL 3549 (C.M.A.1955).

As a matter of "command prerogative" a convening authority "in his sole discretion, may approve, disapprove, commute, or sus-

pend the sentence in whole or in part." Article 60(c)(1)–(2). In exercising discretion, the convening authority must look to what is "warranted by the circumstances of the offense and appropriate for the accused." R.C.M. 1107(d)(2). "As a matter of right, each accused is entitled to an individualized, legally appropriate, and careful review of his sentence by the convening authority." *United States v. Fernandez*, 24 M.J. 77, 78 (C.M.A.1987). "A convening authority is disqualified from reviewing and taking action on a case ... if he 'sets forth in unmistakable terms' his intent to disregard proper review standards during the post-trial review phase of his duties in order to ensure that a certain result adverse to the criminal element is reached." *Id.* at 79 (citations and footnote omitted).

In this case, the convening authority did not set forth in "unmistakable terms" his intent to disregard proper review standards. The convening authority's failure to take a personal meeting with the appellant's defense counsel does not demonstrate an inflexible attitude toward sentencing. The appellant cites no authority supporting this assertion. Additionally, in denying the appellant's request for a personal meeting, the convening authority indicated he would consider matters of clemency submitted in writing. This express indication by the convening authority that he would properly review the appellant's sentence and consider clemency was reflected in the Convening Authority's Action dated 25 November 1997. In his action, the convening authority indicated that he considered the results of trial, his staff judge advocate's recommendations, and the clemency submissions from the appellant. *Id.*

Furthermore, the convening authority's unwillingness to enter into a pretrial agreement in a separate case does not establish an inflexible attitude toward sentencing. The second-hand nature of the information contained in the defense counsel affidavits does little to convince us of an unmistakable statement of intent on the part of the convening authority to disregard proper post-trial re-

SONAL BELIEF THAT TO GRANT CLEMENCY WOULD IMPEACH THE FINDINGS AND SEN-

TENCE OF A MEMBERS PANEL AND THAT IS SOMETHING HE WOULD NEVER DO.

view standards. The substance of the convening authority's statement, as asserted in the affidavit, is not aimed at post-trial review, nor was the statement itself directed at the appellant's case. Furthermore, because we presume regularity in the convening authority's action, the convening authority's offer to consider clemency and subsequent consideration of clemency in this case show that he followed his statutorily required duty, regardless of the contents of the defense counsel's affidavit. *Wise*, 20 C.M.R. at 194.

### C. *Opportunity to comment on post-trial memorandum* [39]

■■■ The appellant claims that a 13 November 1997 memorandum from the staff judge advocate to the convening authority, which was not served on the appellant or his defense counsel, contained new matters that defense counsel was entitled to comment upon per R.C.M. 1106(f)(7). In the 13 November 1997 memorandum, the staff judge advocate gave a timeline of the case, including a note that the defense was late in submitting a response to the SJAR Addendum. This was offered as an explanation for the staff judge advocate's delay in forwarding the case to the convening authority. In the letter, the following options were given to the convening authority:

5. As the convening authority, you are now required to take action in this case. You have the following options:

a. After you have had the opportunity to review the case, and all matters submitted by the defense, grant the defense counsel's request for a personal meeting; or

b. After reviewing the case and all matters submitted by the defense, grant clemency in any form that you deem appropriate, including setting aside findings and reducing the sentence. My staff will prepare an appropriate CA's action if you modify the findings or sentence; or

c. Sign the CA's action provided to approve the findings and sentence as adjudged.

The appellant claims that the language above summarized the convening authority's responsibilities in a way that misled the convening authority in two ways: First, that the convening authority was led to believe that a personal meeting with the defense counsel may not be something that could be readily accomplished, and, second, that section (c) misled the convening authority regarding his post-trial duties.

R.C.M. 1106(f)(7) requires that if an addendum contains "new matter," the defense must be provided with notice and an opportunity to respond before the convening authority takes action on the sentence. The non-binding discussion accompanying R.C.M. 1106(f)(7) provides a number of examples of what could be considered a new matter: " 'New matter' includes discussion of the effect of new decisions on issues in the case, matter from outside the record of trial, and issues not previously discussed." "New matter" does not ordinarily include any discussion by the staff judge advocate of the correctness of the initial defense comments on the recommendation. *United States v. Frederickson*, 63 M.J. 55, 56 (C.A.A.F.2006).

The failure to serve a new matter on the defense is not necessarily prejudicial if the new matter is "so trivial as to be non-prejudicial" or where the matter was "neutral, neither derogatory nor adverse to [the] appellant." *United States v. Jones*, 44 M.J. 242, 244 (C.A.A.F.1996).

The burden is on the appellant to "demonstrate prejudice by stating what, if anything, would have been submitted to deny, counter or explain the new matter." *United States v. Chatman*, 46 M.J. 321, 323 (C.A.A.F.1997) (citation and internal quotation marks omitted). Although the threshold is "low," *United States v. Catalani*, 46 M.J. 325, 327 (C.A.A.F.1997), an appellant must demonstrate that the proffered response to the unserved addendum "could have produced a different result." *United States v. Brown*, 54 M.J. 289, 293 (C.A.A.F.2000).

The untimeliness of the trial defense counsel's submission is not a "new matter," but

---

39. AOE XXXII. THE ADDENDUM TO THE STAFF JUDGE ADVOCATE'S RECOMMENDATION MISLED THE CONVENING AUTHORITY AND CONTAINED NEW MATTERS BUT WAS NOT SERVED UPON APPELLANT'S SUBSTITUTE DEFENSE COUNSEL.

rather a comment on the state of the case which was known to the appellant at this time and cannot be construed to suggest that this fact should bear on the convening authority's decision. *See United States v. Buller*, 46 M.J. 467, 468 (1997). Nor is the list of options given to the convening authority a new matter. When read alone, option (c) may be misleading. However, when read in conjunction with the original SJAR and addendum to the SJAR, this memorandum correctly sets out proper courses of action for the convening authority. *See* SJAR of 7 Feb 1997 and SJAR Addendum of 27 Oct 1997.

Even assuming error, the appellant has failed to articulate prejudice. He claims that, had he been able to respond to the memorandum, he would have explained that the convening authority did not have to review the materials before meeting with the trial defense counsel and that it was an option to meet with the trial defense counsel and still follow course (c). The appellant contends he would have further clarified that, although the memorandum stated it was time for the convening authority to act, that the convening authority could take whatever time he needed in discharging his duties. Neither of these proposed theories demonstrates how the ability to comment would have produced a different result. *See Brown*, 54 M.J. at 293. First, the trial defense counsel failed to outline what matters he would have advanced if he had been granted an audience with the convening authority. Nor does the appellant explain what might have been gained by better explaining the convening authority's post-trial processing options and responsibilities, both of which had previously been laid out in the original SJAR and addendum to the SJAR. Rather, the convening authority's action contains a wholly appropriate recitation of the convening authority's proper consideration of matters for the purposes of clemency. Accord-

ingly, the appellant has not met his burden of showing defect or prejudice. We decline to provide relief based on this assignment of error.

### D. Representation by appellate counsel [40]

An appellant has a right to detailed military defense counsel who:

> [S]hall represent [the appellant] before the Court of Criminal Appeals, the Court of Appeals for the Armed Forces, or the Supreme Court—(1) when requested by [the appellant]; (2) when the United States is represented by counsel; or (3) when the Judge Advocate General has sent the case to the Court of Appeals for the Armed Forces.

Article 70, UCMJ. This right is based upon fundamental notions of due process found in the 5th and 6th Amendments to our Constitution and is rightly considered one of the most important aspects of our criminal justice system. *See Diaz v. The Judge Advocate General of the Navy*, 59 M.J. 34, 37 (C.A.A.F.2003). However, the appellant cites no controlling case and we are aware of none that requires strict continuity of appellate defense counsel. Although this case is nearly twenty years old and has involved numerous counsel representing both the appellant and the Government, we disagree that the periodic substitution of counsel has deprived the appellant of his substantive rights or prejudiced him in any way. Having reviewed the record and the extensive briefs, motions and other written filings prepared by the appellant's detailed military attorneys, we are convinced that his counsel have been more than competent in their defense of the appellant during the appeals process to date.

### IX. Post–Trial Delay[41]

We next address undue delay in processing this case through our court. As with all areas of substantive law, the appellant can

---

40. AOE XLIII. THE LACK OF CONTINUITY OF APPELLATE DEFENSE COUNSEL, WHERE MORE THAN SEVEN DIFFERENT COUNSEL HAVE REPRESENTED APPELLANT BEFORE THE COMPLETION OF HIS FIRST LEVEL OF APPELLATE REVIEW, HAS DENIED APPELLANT DUE PROCESS IN VIOLATION OF THE FIFTH AMENDMENT.

41. AOE XLVI. THE POST–TRIAL DELAY IN THIS CASE IS SO EXCESSIVE, EVEN FOR A CAPITAL CASE, THAT IT REQUIRES THE SENTENCE OF DEATH TO BE SET ASIDE EVEN IF APPELLANT'S ANXIETY OVER A PENDING DEATH SENTENCE IS NOT CONSIDERED. (Citation omitted).

afford himself of the protections of case law formulated during the interregnum between the trial date and issuance of our opinion. The issue of undue post-trial delay does present itself in this matter. *See United States v. Moreno,* 63 M.J. 129 (C.A.A.F.2006).

We considers four factors in determining if post trial delay violates the appellants due process rights: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to a timely appeal; and (4) prejudice to the appellant. *Toohey v. United States (Toohey I ),* 60 M.J. 100, 102 (C.A.A.F.2004) (citing *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). "Once this due process analysis is triggered by a facially unreasonable delay, the four factors are balanced, with no single factor being required to find that post-trial delay constitutes a due process violation." *United States v. Foster,* No. 200101955, 2009 WL 382002, at *8, 2009 CCA LEXIS 62, at *24–25, unpublished op. (N.M.Ct.Crim.App. 17 Feb. 2009) (citing *Moreno,* 63 M.J. at 136). In egregious cases, the delay itself may " 'give rise to a strong presumption of evidentiary prejudice' ". *United States v. Jones,* 61 M.J. 80, 83 (C.A.A.F.2005) (quoting *Toohey I,* 60 M.J. at 102). We look to "the totality of the circumstances in a particular case" in deciding whether relief is warranted. *United States v. Allison,* 63 M.J. 365, 371 (C.A.A.F.2006). The standard of review for a claim alleging denial of speedy post-trial review and appeal is *de novo.* *United States v. Dearing,* 63 M.J. 478, 486 (C.A.A.F.2006).

The appellate history of this case reveals facially unreasonable delay. Beginning in 1996, following significant delay before the convening authority acted on the matter, this case has been dominated by repeated grants of enlargements of time—more than 60 in total. Many of these enlargements of time were requested by the appellant. In January 2003, this inaction drew an order from the CAAF directing a review of the panel assignment for this case by this Court, followed by another mandate in March 2005 requiring us to consider the continued viability of the death penalty in this case based upon the mental capacity of the appellant.

Between 2005 and May 2007 this court was operating under a stay, ordered by the CAAF, which prohibited us from acting on this case under Article 66(c), UCMJ, until such time as we had answered the remanded issue of mental responsibility. That stay was lifted on 24 May 2007. We ordered a *DuBay* Hearing as to mental responsibility of the appellant on 7 September 2006. This *DuBay* process was handled in a less than prompt manner, which necessitated our intervention by order of 24 May 2010. Unfortunately, the Government's appeal of our order, which was summarily denied by the CAAF, led to some additional months of delay in the processing of this case.

Turning to the factors outlined in *Toohey I,* we find it disturbing that it has taken over 19 years to complete our initial review of the appellant's conviction under Article 66(c), UCMJ. While this court bears responsibility for a portion of this delay, so too does the Government and the appellant, who each requested dozens of extensions of time at various stages of the post-trial and appellate process. Additionally, a multi-year stay in order to address the appellant's mental competency was a contributing factor. It is evident that the appellant, for whatever reason, invited a certain amount of delay in this case. Additionally, we find that the appellant has not been prejudiced by the delay and in fact has benefited from changes in the law that came about after his trial. Finally, we note that this is capital litigation, necessitating an expanded view of the time it takes to complete appellate review.

Although the delay in this case is facially unreasonable, we do not find that the appellant's due process rights were violated. In balancing the four *Toohey* factors, we note that a large portion of the delay in this case was attributable to the appellant and/or unavoidable hearings and orders. Additionally, any prejudice to the appellant was minimal. As such, the post-trial delay in this case does not warrant relief.

## X. Summary Assignments of Error

## A. Fixed terms for judges [42]

This argument has been repeatedly dismissed by appellate courts. *See Loving*, 41 M.J. at 295 (citing *United States v. Graf*, 35 M.J. 450 (C.M.A.1992)). We follow this well-established precedent and decline to provide the appellant relief on this ground.

## B. Appointment of judges [43]

*See id.*

## C. Trial judge and convening authority as "principal officers" [44]

*See United States v. Grindstaff*, 45 M.J. 634, 636 (N.M.Ct.Crim.App.1997).

## D. Admission of Prosecution Exhibit 126 (the gloves) [45]

We decline to address this argument as this evidence relates solely to the LCpl James killing. Having set-aside those convictions related to LCpl James, this issue is moot.

## E. Reasonable doubt instruction [46]

This issue has been resolved against the appellant. *Loving*, 41 M.J. at 281.

## F. Mandatory minimum sentence [47]

Article 118(1), UCMJ, mandates a minimum punishment of life in prison. This does not constitute cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution. *Curtis*, 44 M.J. at 157 (citing *Harmelin v. Michigan*, 501 U.S. 957, 994–95, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)). Consequently, this assignment of error is without merit.

## XI. Cumulative Error [48]

The appellant contends that the accumulation of errors described within his briefs requires us to evaluate the fairness of the appellant's trial using the cumulative error doctrine. We agree. *United States v. Dollente*, 45 M.J. 234, 242 (C.A.A.F.1996); *see also United States v. Banks*, 36 M.J. 150, 171 (C.M.A.1992). The CAAF has made clear that the scope of our evaluation of errors in a case should be made:

> [A]gainst the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy—of any remedial efforts); and the strength of the government's case.

*Dollente*, 45 M.J. at 242 (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir.1993)) (alteration in original). Our review necessarily encompasses " 'all errors preserved for appeal and all plain errors.' "

---

42. AOE XLVIII. DUE PROCESS REQUIRES THAT TRIAL AND INTERMEDIATE APPELLATE JUDGES IN A PEACETIME MILITARY DEATH PENALTY CASE HAVE THE PROTECTION OF A FIXED TERM OF OFFICE. (Citation omitted).

43. AOE XLIX. THE SYSTEM WHEREBY THE JUDGE ADVOCATE GENERAL OF THE NAVY APPOINTS TRIAL AND APPELLATE JUDGES TO SERVE AT HIS PLEASURE IS UNCONSTITUTIONAL AS IT VIOLATES THE APPOINTMENTS CLAUSE. (Citation omitted).

44. AOE L. APPELLANT'S COURT–MARTIAL LACKED JURISDICTION BECAUSE THE MILITARY JUDGE AND THE CONVENING AUTHORITY WERE "PRINCIPAL OFFICERS" WHOM THE PRESIDENT DID NOT APPOINT AS REQUIRED BY THE APPOINTMENTS CLAUSE. (Citations omitted).

45. AOE CVI. THE MILITARY JUDGE ERRED BY DENYING APPELLANT'S MOTION TO EXCLUDE PROSECUTION EXHIBIT 126 (THE GLOVES) FROM EVIDENCE. (Citations omitted).

46. AOE CXVII. THE MILITARY JUDGE COMMITTED PLAIN ERROR BY INSTRUCTING ON FINDINGS AND SENTENCING THAT REASONABLE DOUBT MEANT PROOF TO A MORAL CERTAINTY RATHER THAN PROOF TO AN EVIDENTIARY CERTAINTY. (Citations omitted).

47. AOE CXXIX. ARTICLE 118(1)'S MANDATORY MINIMUM LIFE SENTENCE IS UNCONSTITUTIONAL AS CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE 55, UCMJ. (Citations omitted).

48. AOE CXXXIV. THE NUMEROUS ERRORS WHICH OCCURRED DURING THIS COURT–MARTIAL CANNOT BE FOUND HARMLESS WHEN CONSIDERED COLLECTIVELY.

*Id.* (quoting *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir.1993)). Finally, we must consider any "traces" of prejudice that might resonate even after an error is cured by judicial instruction. *Necoechea*, 986 F.2d at 1282.

As this opinion reflects, the court has taken significant exception to the trial judge's failure to issue certain instructions. The importance of limiting instructions, including evidentiary instructions addressing MIL. R. EVID. 404(b) evidence as well as instructions dealing with the substantive charges of which the appellant stands convicted, cannot be overstated.

Additionally, we again note the failure of the trial judge to advise this court as to his consideration of MIL. R. EVID. 403 when weighing the admission of matters under MIL. R. EVID. 404(b). These omissions, taken in conjunction with the general admission of post-conspiratorial hearsay statements, were particularly devastating to appellant. *Clark*, 61 M.J. at 707.

Finally, the court has grave concern over the admission into evidence of the appellant's claim that he shot an AK–47 in a drive-by shooting in Philadelphia prior to the 26 March shooting of LCpl Page. As indicated above, this incendiary matter was admitted without a proper evaluation under MIL. R. EVID. 403 by the trial judge. There can be no question that the Government exploited the openings offered by the trial judge's rulings as they referenced drive-by shootings and the appellant's seeming infatuation with same four times in their closing argument. Record at 1377, 1381, 1385, and 1388.

These errors unquestionably necessitated judicial action in regards to the appellant's convictions for those crimes related to LCpl James. The instructional and evidentiary errors committed during the appellant's trial, whether taken alone or considered cumulatively, required us to overturn those convictions. However, we again reiterate our confidence in the reliability of the appellant's conviction for those crimes associated with the killing of LCpl Page, including premeditated murder. Any instructional or evidentiary errors committed during the appellant's trial, even when considered cumulatively,

were vitiated by the overwhelming evidence supporting the appellant's guilt.

## XII. Conclusion

In promulgating this opinion, the court resolves more than thirty assignments of error presented by the appellant as well as several additional issues that we chose to address. Due to the manner in which we have adjudicated this matter, myriad assignments of error were rendered moot.

■■■ Initial appellate resolution in this matter under Article 66(c), UCMJ, has been realized nearly nineteen years after the members returned a verdict and attendant sentence of death. The case was referred as capital for good reason—the appellant's premeditated murder of LCpl Page, his fellow Marine, was carried out with chilling callousness and depravity. We have upset aspects of this verdict and will set aside the death penalty due to numerous and substantive procedural and legal failures at trial, some leading to constitutional deprivation. Yet no error by the trial judge below should distract us from the *overwhelming evidence of the appellant's guilt* as to the robbery and murder of LCpl Page. This was truly a heinous killing and, minus the errors cited above, assuming the death penalty was awarded, we would have affirmed the sentence as adjudged for the LCpl Page murder taken alone.

The appellant's convictions under Specification 1 of Charge I, Specification 1 of Charge II, Specifications 1 and 2 of Charge III, and Charge IV and its specification are affirmed. The appellant's convictions under Specification 2 of Charge I, Specification 2 of Charge II, Specification 3 of Charge III and Specifications 1 and 2 of Charge V are set aside and those offenses are dismissed. In accordance with *United States v. Moffeit*, 63 M.J. 40, 41 (C.A.A.F.2006) (citing *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986)), we have reassessed the sentence and set the sentence of death aside and affirm a sentence to include confinement for the remainder of the appellant's natural life, total forfeiture of pay and allowances, reduction to pay grade E–1, and a dishonorable discharge. We are satisfied that, absent any error, the

adjudged sentence for the murder of LCpl Page and attendant convictions would have been at least life in prison, total forfeitures, reduction to pay grade E–1, and a dishonorable discharge. *Id.* Similarly, we are convinced beyond a reasonable doubt that our reassessment has cured any error related to those convictions we have upheld. *United States v. Doss,* 57 M.J. 182, 185 (C.A.A.F. 2002).

Senior Judge CARBERRY and Senior Judge MODZELEWSKI concur.

**UNITED STATES of America**